797 P.2d 246

Dorothy M. **FOLZ**, as Personal Representative of Sylvester C. Folz, Deceased, Steve D. Folz, Deceased, Dorothy M. Folz, Individually, and Rita Garcia, as Personal Representative of the Estate of Leo L. Garcia, Deceased, Petitioners,

v.

The STATE of New Mexico and the New Mexico Highway Department, an agency, Respondents.

No. 18029.

Supreme Court of New Mexico.

Aug. 8, 1990.

· Louis Marjon, Albuquerque and James P. Cunningham, Phoenix, Ariz., for petitioners.

Civerolo, Hansen & Wolf, William P. Gralow, Gallagher & Casados, J.E. Casados, and Butt, Thornton & Baehr, J. Duke Thornton, Albuquerque, for respondents.

Carpenter & Goldberg, William H. Carpenter and Michael B. Browde, Albuquerque, for amicus curiae New Mexico Trial Lawyers Ass'n.

Atwood, Malone, Mann & Turner, Steven L. Bell, Roswell, for amicus curiae New Mexico Defense Lawyers Ass'n.

Simons, Cuddy & Friedman, Charlotte H. Hetherington, Santa Fe, for amicus curiae Risk Management.

## OPINION

RANSOM, Justice.

This wrongful death and personal injury action was brought against the state and its agency, the Highway Department, and against Slurry Seal, Inc., a highway construction company. Plaintiffs claimed that negligence in the control of traffic at a

mountain-site construction project contributed to deaths and injuries from a runaway truck driven by Enrique Peters. A verdict of $651,686.85 was rendered against the Department. Under the Tort Claims Act, NMSA 1978, Sections 41–4–1 to –27 (Repl. Pamp.1989), the statutory immunity from tort liability enjoyed by a governmental entity does not apply to highway maintenance. Section 41–4–11(A). Liability, however, is limited to $500,000 "for all claims arising out of a single occurrence," Section 41–4–19(A)(3), and no judgment may include an award for exemplary or punitive damages. Section 41–4–19(B).

We issued our writ of certiorari to the court of appeals to review (1) whether the "single occurrence" limit of $500,000 applies to the sum of damages caused by the runaway truck's successive and separate collisions with multiple vehicles; (2) whether the bar to punitive damages against the Department affects the mandate of the New Mexico uniform jury instruction on wrongful death that, in fixing the amount of damages it deems fair and just, the jury should include in its award compensation for "mitigating or aggravating circumstances" attending the wrongful act, neglect, or default, SCRA 1986, 13–1830; and (3) whether, to recover for severe shock from witnessing the death of her husband and fatal injuries to her son, an injured passenger in one of the automobiles was required to prove by expert medical testimony, or otherwise, a physical manifestation of her emotional injury.

We affirm the court of appeals in its application of the "single occurrence" limit of $500,000; we reverse its finding of error in the trial court's wrongful death instruction that included a reference to "aggravating circumstances;" and we take this opportunity to reexamine the tort of negligent infliction of emotional distress articulated in *Ramirez v. Armstrong*, 100 N.M. 538, 673 P.2d 822 (1983). Specifically, we reject the *Ramirez* requirement that "[t]here must be some physical manifestation of, or physical injury to the plaintiff resulting from the emotional injury." *Id.* at 542, 673 P.2d at 826.

In 1981 the Department contracted with Slurry Seal to resurface a mountainous portion of Highway 82 between Cloudcroft and Alamogordo. Plaintiffs alleged that defendants knew or should have known this portion of the highway contained steep downhill grades and had a history of runaway trucks, and that they were negligent in failing to design and implement an appropriate traffic-control plan for the project. On July 22, 1981, Slurry Seal was working on a stretch of highway that ran between milepost 8.1 to the east and a tunnel to the west. For some distance east and west beyond milepost 8.1 and the tunnel, the construction company had placed a series of signs warning motorists to be prepared to stop. As the work crew resurfaced the eastbound (uphill) lane, an escort vehicle was to shuttle traffic alternately up and down the westbound lane.

At the time of the tragedy giving rise to this lawsuit, the escort vehicle was proceeding uphill through the construction site, leading a line of seven to twelve eastbound vehicles. A flagman at the uphill end of the construction had stopped about ten westbound cars when there came into view a heavily-laden truck proceeding at great speed downhill in the westbound lane. Its wheels were smoking. The truck, driven by Peters, had experienced brake failure and was out of control. Peters managed to swerve around the stopped, westbound vehicles and back into the westbound lane. By this time the escort vehicle and the first two cars in the line of vehicles proceeding uphill had cleared the construction area and had returned to the eastbound lane. Peters, unable to stop or avoid the oncoming traffic, sideswiped the third vehicle as its driver, Nettye Motten, attempted to maneuver into the uphill lane and out of the path of the runaway truck. Peters' truck continued downhill and collided with three other vehicles, one driven by George Allegar, another by Sylvester Folz, and a third by Sherri Calkins. Finally, the truck struck a Slurry Seal construction vehicle and came to a stop. In striking these five vehicles, Peters' truck had travelled a distance of 500 to 600 feet. The jury allocated twenty

percent of the fault to Peters, thirty-five percent to Slurry Seal, and forty-five percent to the Department.

■ Thomas Tallant, the minor son of Nettye Motten, was injured. Sylvester Folz died at the scene of the accident. His wife, plaintiff Dorothy Folz, suffered multiple injuries, while their son Steven died several days later as the result of his injuries. Leo Garcia, an employee of Slurry Seal, was thrown from the construction vehicle and burned to death in a fire caused by a ruptured gasoline tank. The jury awarded damages as follows: Dorothy Folz, individually, $306,907.10; Dorothy Folz, as personal representative of the estate of Sylvester Folz, $206,203.18; Dorothy Folz, as personal representative of the estate of Stephen Folz, $329,107.02; Rita Garcia, as personal representative of the estate of Leo Garcia, $500,000; and Nettye Motten, on behalf of Thomas Tallant, $105,975.76. The verdict against the state was $651,686.85, or forty-five percent of the total. The court entered judgment for plaintiffs but limited the damages recoverable against the state to a total of $500,000 on the basis of the liability cap.[1]

■ *Department's acts gave rise to a single occurrence.* Plaintiffs contend each collision of the runaway truck was a separate occurrence, and, therefore, the statutory limitation of $500,000 applies separately to all victims injured as a result of each of five occurrences. The court of appeals concluded that plaintiffs' aggregate recovery against the state must be limited to $500,000 because plaintiffs' injuries arose from a single occurrence as that term is used in Section 41–4–19(A)(3).[2] We agree.

■ The term "single occurrence" is not defined in the Tort Claims Act. In its opinion, the court of appeals drew upon the interpretation given that term in the judicial decisions of other jurisdictions concerned with the meaning of liability insurance contracts. Within that context three approaches have been used: (1) looking to *the effects of the accident,* that is, the number of injured persons, *e.g., Kuhn's of Brownsville, Inc. v. Bituminous Casualty Co.,* 197 Tenn. 60, 270 S.W.2d 358 (1954); (2) looking to *the proximate cause or causes* of the injury or injuries, *e.g., Home Indemnity Co. v. City of Mobile,* 749 F.2d 659 (11th Cir.1984); and (3) looking to *the event which triggered liability,* that is, the one event of an unfortunate character that takes place without foresight or expectation and subjects the insured to liability. *See, e.g., Shamblin v. Nationwide Mut. Ins. Co.,* 332 S.E.2d 639 (W.Va.1985). *See generally* Annotation, *What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount per Accident or Occurrence,* 64 A.L.R. 4th 668 (1988).[3]

1. Section 41–4–19(A) of the New Mexico Tort Claims Act provides:

In any action for damages against a governmental entity or a public employee while acting within the scope of his duties as provided in the Tort Claims Act, the liability shall not exceed:

(1) the sum of one hundred thousand dollars ($100,000) for damages to or destruction of property arising out of a single occurrence;

(2) the sum of three hundred thousand dollars ($300,000) to any person for any number of claims arising out of a single occurrence for all damages other than property damage as permitted under the Tort Claims Act; or

(3) the sum of five hundred thousand dollars ($500,000) for all claims arising out of a single occurrence.

2. Although not at issue in this case and not necessary to our decision here, Section 41–4–19 does not purport to limit the liability of the state and its entities in the aggregate. Rather, this Section specifically applies to the liability of "a governmental entity or public employee." "[I]t is only when the public entity is itself acting through its employee * * * that the Tort Claims Act comes into play. The public entity can act only through its employees, and the act of the offending employee is the act of the public entity under [the] traditional tort [doctrine of *respondeat superior*]." *Silva v. State,* 106 N.M. 472, 477, 745 P.2d 380, 385 (1987). It thus would appear that multiple governmental entities each could be liable for concurrent negligence to the limits of the Act under consideration here, but only for that portion of the total liability attributed to the entity or its employees.

3. It must be acknowledged that the legislature certainly might have used the term "single occurrence" in a different sense than the one used in the insurance industry. In addition, principles of statutory construction and contract circumstances may lead to differing interpretations of similar terms. The Tort Claims Act is

—"*Effects*" *(number of injured persons) does not determine number of occurrences.* With regard to statutory maximum awards, legislatures have used three approaches to address recovery for multiple plaintiffs or claims: the "per incident or occurrence" standard; the "per person or claimant" standard; and the "per claim" standard. *See* Annotation, *Validity and Construction of Statute or Ordinance Limiting the Kinds or Amount of Actual Damages Recoverable in Tort Action Against Governmental Unit*, 43 A.L.R. 4th 19, 26 (1986).[4] New Mexico utilizes a "per-person" standard permitting an award of damages up to $300,000 to each person for all claims arising out of a single occurrence, *see* Section 41–4–19(A)(2), subject further to a higher $500,000 limit for all claims arising out of a single occurrence. *See* § 41–4–19(A)(3).

Under the New Mexico scheme it cannot be argued that the number of injured persons was intended to determine the number of occurrences, *i.e.*, that the legislature intended to adopt the so-called "effects" approach in articulating the "single occurrence" standard. While the limitation on all claims of individual persons is determined by subsection (A)(2), subsection (A)(3) clearly addresses the aggregate claims of multiple plaintiffs with any number of claims arising out of the same occurrence. This interpretation is consistent with both the express and implicit interpretations given similar "per person" and "per occurrence" limitation provisions in other jurisdictions. *See, e.g., Gleason v. City of Oklahoma City*, 666 P.2d 786 (Okla.Ct. App.) (when aggregate limitation on damages not reached, multiple claimants were each entitled to recover up to "any claimant" limitation for all claims arising out of a single occurrence because aggregate limitation "obviously" contemplated multiple claimants in single occurrence), *cert. denied*, 666 P.2d 786 (1983).

—"*Proximate cause*" *alone does not determine number of occurrences.* The court of appeals purported to adopt the general view of a large number of jurisdictions that look to the proximate cause or causes of the accident to determine whether the accident constitutes a single occurrence or multiple occurrences. It would look to the concurrent cause attributable to the governmental entity and include within a "single occurrence" all resulting harm closely connected in time and location. The court stated:

The term "single occurrence," contained in Section 41–4–19, refers to "the act or omission" of the governmental entity or public employee * * * and applies to claims which arose from the same proximate cause [and] embrace[s] those situations where the events resulting from the negligent act or acts of a

in derogation of plaintiffs' common-law right to sue the defendants and, therefore, is strictly construed. *Methola v. County of Eddy*, 95 N.M. 329, 622 P.2d 234 (1980); *see also Holiday Management Co. v. City of Santa Fe*, 94 N.M. 368, 610 P.2d 1197 (1980) (declining to construe waiver provisions of Tort Claims Act in a manner inconsistent with remedial purpose of common-law abrogation of sovereign immunity). While the limitation of liability may form one of the objectives of both insurance companies and the New Mexico legislature, the Tort Claims Act also embodies a governmental desire to balance with this objective the needs of citizens for compensation and the need to impose duties of reasonable care on public employees. *See* NMSA 1978, § 41–4–2 (Repl.Pamp.1989). Nevertheless, when the legislature does not provide an express definition of an essential statutory term, it must be assumed that the legislature was aware of the construction given that term in the judicial decisions of other jurisdictions. *Cf. Buzbee v. Donnelly*, 96 N.M. 692,

699–700, 634 P.2d 1244, 1251–52 (1981) (interpreting undefined statutory term "directly negat[ing] ... guilt" in terms of case-law interpretation of the term "direct evidence"). Cases that determine what constitutes a "single occurrence" within the financial limitations of a contract for liability insurance are, therefore, of some relevance.

4. The doctrine of governmental sovereign immunity has been abolished or substantially abridged in virtually all jurisdictions either through legislation or judicial decision. In conjunction with abolition of immunity (and sometimes in response), numerous jurisdictions, including New Mexico, have passed legislation limiting the damages recoverable against governmental tortfeasors. As with examination of the cases interpreting the term "occurrence" in liability insurance contexts, it also is instructive to compare the New Mexico damage limitation with the limiting legislation of other jurisdictions.

governmental entity or public employee are closely linked together in time and location.

Because the sequence of events in this case all "derived from the same proximate cause and were closely connected in both time and location," the court concluded there was but a single occurrence. The court did not analyze, however, how the successive acts of design (planning) and of implementation or supervision were to be treated as the "same proximate cause" when they concurred to contribute to the accident. In light of this latter consideration, we do not base our application of the statute under the facts here on the notion that the sequence of events giving rise to liability "derived from the same proximate cause."

■ We believe the suggestion of the court of appeals that the term "single occurrence" refers to the "act or omission of the governmental entity" which gave rise to the action is misleading. In some cases, a single, negligent act on the part of the state may coincide with the event that gives rise to damages and liability, such as in the negligent operation of a motor vehicle by an agent of the state. In many other cases, multiple negligent acts or omissions of the state will antedate the event giving rise to liability. In such a case, the term "single occurrence" refers to all harm that, although proximately caused by a particular risk arising from the concurrent operation of one or more successive acts or omissions on the part of a governmental entity, was triggered by a particular event giving rise to liability.[5]

—*"Triggering event" for injuries within singular risk of harm determines occurrence.* Our construction of the meaning of "single ocurrence" and our applica-

tion of that term here are based on the fact that all the injuries (1) lay within a singular risk of harm created by the concurrent operation of the Department's negligent acts and omissions, and (2) were triggered by a discrete event[6]—the runaway truck. The Department committed at least two negligent acts or omissions (planning and implementation) that, although committed successively, combined concurrently with the negligence of the other tortfeasors to proximately cause indivisible harm to each of multiple persons facing the singular risk of a runaway truck. In contrast, Peters, the driver of the runaway truck, may have committed one or more discrete torts with respect to each of the five collisions. Each such discrete tort would have been separated in time, place, and (perhaps) nature, and each in succession would have combined with the negligence of the Department and Slurry Seal to proximately cause the same harm.

We are concerned, however, with the relationship of the Department's negligent conduct to this accident scene, not that of Peters, and we define the scope of a "single occurrence" accordingly. The negligent acts and omissions of the Department and Slurry Seal, although taking place at different points in time, combined to form but a singular, unitary, ongoing risk—that a runaway truck would strike one or more vehicles in an escorted caravan as the result of the collective failure of these parties to design and implement an effective traffic-control plan. Moreover, although the Department could have taken steps to eliminate the danger from runaway trucks, it had no control over whether the driver of a runaway truck would commit additional, independent tortious acts once the truck went out of control. Thus, from the per-

---

**5.** From this perspective it is apparent that the state's total potential liability for an ongoing risk of harm attending a project like this construction project never would be limited to $500,000 for the duration of the project. Here, a separate occurrence would have existed had the events in this case been repeated by a second runaway truck that same day, regardless of whether a subsequent negligent act was committed by the Department. *See Mason v. Home Ins. Co.,* 177 Ill.App.3d 454, 126 Ill.Dec. 841, 532 N.E.2d 526 (1988) (finding a separate occur-

rence each time another customer was served contaminated food), *appeal denied,* 125 Ill.2d 567, 130 Ill.Dec. 482, 537 N.E.2d 811 (1989).

**6.** The event that triggers liability may be a discrete act or omission of the governmental entity, as with the negligence of a public employee that coincides with injury, or the triggering event may be attributable to other persons or forces regardless of whether that event itself constitutes concurring fault.

spective of the governmental entity, there was but a "single occurrence," because the collisions between the truck and each of the five vehicles lay within the scope of consequences portended by its negligence, and because the driver's loss of control was the triggering event that brought this negligence to its tragic fruition.[7]

Although not directly at issue here, it is useful to note a case that held more than one occurrence existed when successive acts of negligence concurred to create multiple risks. In *Home Indemnity Co. v. City of Mobile*, 749 F.2d 659 (11th Cir. 1984), an insurer brought a declaratory judgment action in federal district court, seeking adjudication of the meaning of the term "occurrence" in its policy with the City. Significantly, this policy was purchased in response to the City's exposure to limited liability as a result of the state legislature's partial abrogation of sovereign immunity. The "per occurrence" term in the insurance policy was intended by the parties to cover the City's exposure to $100,000 of liability for property damages "arising out of a single occurrence."

The controversy over the meaning of this provision arose when the City's storm drain system overflowed and caused extensive flooding after three heavy rains in 1980 and 1981.[8] In over 200 different lawsuits, homeowners whose property was damaged by the flooding had alleged that the City was negligent in the planning, construction, operation, and maintenance of its surface water drainage system. The court rejected as too narrow the insurer's argument that equated a separate "occurrence" with all flooding caused by each rainfall, and the court rejected as too broad the homeowners' argument that equated a separate "occurrence" with each incident of property damage.

As in this case, the governmental entity's alleged negligence involved more than one act or omission. Although these acts and

---

7. The court of appeals suggested that, when multiple parties suffer injury, the sequence of events, *e.g.*, the successive acts of the driver in this case, must be linked together closely in time and space to be considered a single occurrence. Other courts likewise have relied upon the time and space linkage. *See Shamblin v. Nationwide Mut. Ins. Co.*, 332 S.E.2d 639 (W.Va. 1985) (one occurrence held to exist when one employee driver of insured negligently radioed second employee driver that it was safe to pass truck, and second employee's negligent attempt to pass resulted in an accident, because acts were closely related in time and concurrently caused the accident); *Olsen v. Moore*, 56 Wis.2d 340, 202 N.W.2d 236 (1972) (one occurrence held to exist when insured's vehicle struck two vehicles almost simultaneously, there was virtually no time or space interval between impacts, and insured never regained control over the vehicle prior to striking second automobile). Petitioner points out the anomaly of a factor requiring events to be "closely linked in time and space," given the court of appeals' purported adoption of a causation approach to the interpretation of a "single occurrence." *Cf.* W.P. Keeton, D.B. Dobbs, R.E. Keeton & D.G. Owen, *Prosser and Keeton on the Law of Torts* § 43 at 283 (5th ed. 1984) (on unforeseeable consequences: "Remoteness in time or space may give rise to the likelihood that other intervening causes have taken over the responsibility. But when causation is found ... it is not easy to discover any merit whatever in the contention that such physical remoteness should of itself [be dispositive].").

Further, petitioner argues, a time and space factor quite probably would call on fact finders to make subjective and unprincipled decisions. For example, had the truck in this case proceeded another quarter mile down the road, still out of control, before striking a sixth vehicle, would this collision have constituted a separate occurrence? Under the theory we adopt today, the same negligent acts and omissions on the part of the Department would have subjected it to "single occurrence" liability for a (hypothetical) sixth collision with the same runaway truck. To the extent no independent, intervening cause cut the chain of causation flowing from the Department's negligence, the sixth collision would have lain within the scope of the same risk of harm that subjected the Department to liability for the previous five collisions.

8. *City of Mobile* concerned the same facts at issue in *Home Indemnity Co. v. Anders*, 459 So.2d 836 (Ala.1984), *appeal after remand sub nom., Home Indemnity Co. of New York v. City of Mobile*, 477 So.2d 312 (Ala.1985), in which the Alabama Supreme Court interpreted the term "occurrence" under the state's tort claims act to refer to all injuries resulting from the same proximate cause. *Anders*, however, declined to decide the facts under this definition, holding that, in light of the pendency of over 200 other suits by injured homeowners, such a determination lay beyond the jurisdictional scope of the declaratory action brought by the City and its insurer. *Anders*, 459 So.2d at 843–44.

omissions occurred at separate times, they created risks that, in various combinations, operated concurrently. Unlike this case, however, the risk created by the alleged negligent construction and maintenance of *each particular storm drain,* although operating concurrently with other acts of negligence by the City, *created a separate risk* of flood damage. Each storm drain represented a singular or unitary risk. Faced with these facts, the Eleventh Circuit Court of Appeals held that:

> [E]ach discrete act or omission, *or series of acts or omissions,* * * * which caused water to flood and damage properties * * * is a single "occurrence" within the terms of the insurance policy. Thus, if on account of the City's negligence a drain on one street was blocked so that water flooded ten houses, * * * that would be one "occurrence". * * * If, at some other location, on account of negligence on the part of the City, a storm sewer spilled over, * * * that would be another occurrence * * *.

749 F.2d at 663 (emphasis added).[9] In the present case, while a "series" of acts or omissions on the part of the Department created an undue risk of injury, these acts contributed to a unitary risk, and only one triggering event occurred giving rise to liability. *Cf. Maurice Pincoffs Co. v. St. Paul Fire and Marine Ins. Co.,* 447 F.2d 204 (5th Cir.1971) (each of eight different instances in which the insured sold contaminated bird seed was a separate occurrence subjecting the insured to liability).

We hold, therefore, that all injuries proximately caused by the governmental agency's successive negligent acts or omissions that combined concurrently to create a singular, separate, and unitary risk of harm fell within the meaning of a "single occurrence" when triggered by the discrete event of one runaway truck.

■ *Wrongful death instruction not error.* Defendants objected to the jury instruction on damages for wrongful death, UJI Civ. 18.30 (Repl.Pamp.1980), because the instruction directs the jury to consider, among other factors, the "mitigating or aggravating circumstances attending the conduct which results in death."[10] This instruction is based on the New Mexico wrongful death statute, NMSA 1978, Section 41–2–3 (Repl.Pamp.1989), which provides in part:

> [T]he jury in every such action may give such damages, compensatory and exemplary, as they shall deem fair and just, taking into consideration the pecuniary injury or injuries resulting from such death to the surviving party or parties entitled to the judgment, or any interest therein, recovered in such action, and also having regard to the mitigating or aggravating circumstances attending such wrongful act, neglect or default.

Defendants contend that the language of UJI Civ. 18.30, directing the jury to consider mitigating or aggravating circumstances in awarding damages, is contrary to the Tort Claims Act, which provides that no judgment against a governmental entity under the Act shall include an award of exemplary or punitive damages. Section 41–4–19(B). The court of appeals agreed that UJI Civ. 18.30 improperly allowed for the imposition of punitive damages against the state. The court based this conclusion on: (1) the interpretation given similar language in the wrongful death statutes of certain other jurisdictions, and (2) the close parallel between the language in the instruction given and the "aggravating and mitigating circumstances" element in SCRA 1986, 13–1827, the uniform instruction on punitive damages. We find neither of these considerations persuasive.

---

9. The court was not clear as to whether it would find three occurrences to exist if, *e.g.,* a single, negligently maintained storm drain had flooded a certain number of houses during each of the heavy rains. However, in light of the court's discussion of *United States Fire Insurance Co. v. Safeco Insurance Co.,* 444 So.2d 844 (Ala.1983), such a conclusion seems likely. *See* 749 F.2d at 662.

10. UJI Civ. 18.30 has been amended since the time of the Folz trial in August 1984. The uniform instruction now refers to the "mitigating or aggravating circumstances attending the wrongful act, neglect or default." SCRA 1986, 13–1830.

■ The court of appeals opinion relied heavily on the Arizona Supreme Court's interpretation of that state's wrongful death statute.[11] The court of appeals' reliance on Arizona law was misplaced. The Arizona court based its interpretation on the legislative history of the Arizona wrongful death statute; however, New Mexico courts previously have considered the meaning of the "mitigating or aggravating circumstances" language in our statute in light of its history and have come to a contrary conclusion.

In *Boies v. Cole*, 99 Ariz. 198, 407 P.2d 917 (1965) (en banc), the Arizona Supreme Court reinstated a punitive damage award in a wrongful death action. The court began its analysis with the observation that, at one time, Arizona's wrongful death statute expressly had allowed for exemplary damages, Ariz.Rev.Stat. § 2147 (1887), but that this provision thereafter had been eliminated. The amended statute, providing for such damages as the jury deemed "fair and just," was held to provide for recovery of compensatory damages only. *See Downs v. Sulphur Springs Valley*

*Elect. Coop.*, 80 Ariz. 286, 297 P.2d 339 (1956).

In July 1956, however, the Arizona legislature again amended the statute. The amended statute provides for the award of such damages as are "fair and just * * * also hav[ing] regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default." *See Boies*, 99 Ariz. at 204, 407 P.2d at 920 (quoting Ariz.Rev.Stat. §§ 12–611, –613). The *Boies* court reasoned that this additional phrase, coming so close on the heels of its decision in *Downs*, indicated a legislative intent once again to provide for punitive damages.[12]

New Mexico's wrongful death statute has a different history. The original New Mexico statute was, in pertinent part, identical to the Arizona statute construed in *Boies*: the jury was to award such damages as it deemed "fair and just * * * having regard to the mitigating or aggravating circumstances attending such wrongful act, neglect or default." 1882 N.M.Laws, Ch. 61 § 3. To this statute, New Mexico then *added* an express provision *allowing for punitive damages*. *See*

**11.** Three jurisdictions in addition to New Mexico appear to have statutes that use the term "mitigating or aggravating circumstances" in defining the measure of damages that may be recovered in a wrongful death action: Arizona, Missouri, and Colorado. *See generally* 1 S. Speiser, *Recovery for Wrongful Death* § 3:4 (2d ed. 1975 & Cum.Supp.1988). Although we do not discuss the Missouri and Colorado statutes in detail in the body of this opinion, we describe them briefly below.

Missouri provides for the recovery of damages as the jury deems "fair and just" having regard for pecuniary losses and the value of services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support. Additionally, the pain and suffering of the decedent expressly is included in the measure of recovery. Finally, "[t]he mitigating or aggravating circumstances attending the death may be considered by the trier of the facts." *See* Mo.Rev.Stat. § 537.090 (1986). The Missouri Supreme Court has held that, while damages for aggravating circumstances in a sense may be considered punitive in nature, there can be no recovery in a wrongful death case for punitive damages as such. *Glick v. Ballentine Produce, Inc.*, 396 S.W.2d 609, 616 (Mo.1965), *appeal dismissed*, 385 U.S. 5, 87 S.Ct. 44, 17 L.Ed.2d 5 (1966). A party may, however, plead

and submit appropriate instructions on the question of mitigating or aggravating circumstances, if the evidence justifies it. To submit the issue to the jury, Missouri requires "a showing of willful misconduct, wantonness, recklessness, or a want of care indicative of indifference to consequences." *Richeson v. Hunziker*, 349 S.W.2d 50, 53 (Mo.1961). *Cf. Morrissey v. Welsh Co.*, 821 F.2d 1294, 1302 (8th Cir.1987) (purpose of Missouri statute is to punish wrongdoer).

By contrast, the Colorado statute, like the Arizona statute, provides for damages the jury deems "fair and just * * * having regard to the mitigating or aggravating circumstances attending any such wrongful act, neglect or default * * *." Colo.Rev.Stat. § 13–21–203 (Repl.Pamp. 1987). Unlike Arizona, however, the Colorado statute has been interpreted to allow the award of compensatory damages only. *Moffat v. Tenney*, 17 Colo. 189, 30 P. 348 (1892).

**12.** In Arizona, unlike New Mexico, the plaintiff is not entitled to a separate instruction on punitive damages once the jury has been instructed in accordance with the "aggravating circumstance" language of the wrongful death statute, since the two instructions deal "with the same subject matter." *Quinonez v. Andersen*, 144 Ariz. 193, 199, 696 P.2d 1342, 1348 (Ct.App. 1984).

1891 N.M.Laws, Ch. 49 § 2. These provisions of the statute have not been amended subsequent to 1891. *Cf.* § 41–2–3.

In 1969, based on this sequence of events, the court of appeals itself rejected the argument that "the reference to mitigating or aggravating circumstances refers only to exemplary damages." *Stang v. Hertz Corp.*, 81 N.M. 69, 78, 463 P.2d 45, 54 (Ct.App.1969), *aff'd*, 81 N.M. 348, 467 P.2d 14 (1970). A different interpretation, the court reasoned, would have rendered superfluous the addition of the express provision for punitive damages. *Id. Stang* noted the effect given this statutory language in *Kilkenny v. Kenney*, 68 N.M. 266, 361 P.2d 149 (1961). *Kilkenny* held, based in part on this language, that there may be recovery for the decedent's pain and suffering and for the cost of medical care between the time of the injury and death, in addition to damages based on the present worth of the life of the decedent to the decedent's estate (including both pecuniary and non-pecuniary value). *Cf. Mangus v. Miller*, 35 Colo.App. 335, 535 P.2d 219 (phrase "mitigating or aggravating circumstances" in Colorado wrongful death statute contemplates circumstances not relating to the wrongful act itself; rather language contemplates circumstances affecting actual damages suffered by the surviving party entitled to sue, either by way of diminishment or enhancement), *cert. dismissed*, 189 Colo. 481, 569 P.2d 1390 (1975).

Although a jury usually is not instructed to consider "mitigating or aggravating circumstances" in determining compensatory damages, it must be remembered that a wrongful death action, as a statutory action, is *sui generis*. Common law concepts, while informative, are not dispositive of statutory law. Irrespective of exemplary damages, this Court has long recognized that:

> The statutes allowing damages for wrongful act or neglect causing death have for their purpose more than compensation. It is intended by them, also, to promote safety of life and limb by making negligence that causes death costly to the wrongdoer. *Hogsett v.*

*Hanna* [41 N.M. 22, 63 P.2d 540 (1936)], *supra; Trujillo v. Prince*, 42 N.M. 337, 78 P.2d 145 (1938); *Tauch v. Ferguson-Steere Motor Co.*, 62 N.M. 429, 312 P.2d 83 (1957).

*Stang v. Hertz Corp.*, 81 N.M. at 350–51, 467 P.2d at 16–17. Our statute plainly distinguishes between compensatory and exemplary damages but does not restrict the required consideration of mitigating or aggravating circumstances to the latter. Moreover, the statute's specific allowance of such consideration comports well with common trial experience that mitigating and aggravating circumstances indeed do have an effect on jury awards of compensatory damages. Under our fault system, there is a policy of deterrence associated with responsibility for compensatory damages. This fact is at the heart of fault versus no-fault policy considerations. It is a question separate from that of punitive damages.

Significantly, there is an established practice in this state to instruct juries on "mitigating or aggravating" circumstances bearing on wrongful death damages. If the statutory construction expressed by this experience is to give way to the pure logic that separates damages from fault as argued in the special concurrence of Justice Montgomery, then it should be for the legislature and not this Court to express a legislative intent contrary to the construction given the statute by existing appellate decisions and by the uniform jury instructions mandated by this Court.

By virtue of the statute's failure to restrict the required consideration of mitigating or aggravating circumstances to exemplary damages, and by virtue of the purpose and meaning of the statute as construed in our previous cases and uniform jury instructions, we conclude that consideration by the jury of mitigating or aggravating circumstances in setting compensatory damages comports with Section 41–2–3.

What is more important here, however, is that the instructions in this case did not fail to provide adequate guid-

ance to the jury on the task that lay before it. The prohibition in Section 41–4–19(B) barring award of exemplary damages against the state was made quite clear. In reviewing claimed error in jury instructions, appellate courts should consider the instructions as a whole. Instructions will be held adequate if they fairly represent the law applicable to the issue in question. *See Sturgeon v. Clark*, 69 N.M. 132, 138, 364 P.2d 757, 761 (1961). As discussed above, the wrongful death instruction given in this case was an adequate statement of the law. We note that no punitive damage instruction was submitted to the jury as to any defendant, and, moreover, that the trial court orally advised the jury on two different occasions that it was not to award punitive damages against the state. In a wrongful death action in which the state is a defendant and punitive damages are sought against another party, it may prove helpful for the court specifically to instruct the jury that, as to the state, no damages may be awarded under UJI Civ. 13–1827 to punish for acts that were willful, wanton, malicious, reckless, grossly negligent, fraudulent, or in bad faith. Here, however, we believe it unlikely that, having been cautioned by the judge and having before it no instruction on punitive damages, the jury was confused by the "mitigating or aggravating circumstances" language as applied to the Department, and we conclude there was no error.

*Emotional distress of family member.* Following the collision, Dorothy Folz removed herself from the wreckage and witnessed her husband take his last breath. As she unsuccessfully tried to remove their son Steven, she heard him screaming, "Daddy, don't die, Daddy, please don't die." As a rescuer led Folz away from the wreck, she could still hear her son imploring his father not to die. Steven had suffered a severed spinal cord from which he died a few days later. Folz, herself, suffered multiple injuries.

Folz was taken by ambulance to a hospital in Alamogordo where she was reunited immediately with her son. Both subsequently were evacuated by helicopter to a hospital in El Paso. The hospital physician who treated Folz testified that she was shaken and pale, that she complained of a headache and backache, and that she had scratches on her body and forehead. The doctor's diagnosis was that she had sustained a mild head injury and a mild cervical spine injury. In addition, the doctor administered medication to calm her because she was upset about Steven. Folz remained in the hospital for forty-eight hours and was discharged.

A few days later, Folz was rehospitalized complaining of headaches and pains in her chest and abdomen. Upon examination, it was discovered that she had a fractured rib and was suffering from ileus, which is a blockage of the intestinal tract. The doctor stated that the ileus was "secondary to possible fracture of the rib." At trial, the doctor opined as lying within a reasonable medical probability that the ileus also could have been induced by stress.

In *Ramirez* this Court articulated the elements necessary to establish a claim for the recovery of damages due to the negligent infliction of emotional distress. The Court adopted the following standards:

1. There must be a marital or intimate family relationship between the victim and the plaintiff, limited to husband and wife, parent and child, grandparent and grandchild, brother and sister, and to those persons who occupy a legitimate position in loco parentis;

2. The shock to the plaintiff must be severe and must result in a direct emotional impact upon the plaintiff from the contemporaneous sensory perception of the accident, as contrasted with learning of the accident by means other than contemporaneous sensory perception or learning of the accident after its occurrence;

3. There must be some physical manifestation of, or physical injury to the plaintiff resulting from the emotional injury;

4. The accident must result in physical injury or death to the victim.

100 N.M. at 541–42, 673 P.2d at 826–27. In addition, the plaintiff must prove the requi-

site elements of a cause of action in negligence.

The *Ramirez* court specifically addressed whether a bystander, *not in any physical danger*, could recover from the emotional shock of witnessing a person injured through the negligence of another. The Court began its analysis by listing the three rules that had been utilized by other jurisdictions to circumscribe the liability for negligent infliction of emotional distress to a bystander: (1) the "impact" rule, (2) the "zone of danger" rule, and (3) the *Dillon* rule. *Id.* at 540, 673 P.2d at 825.

Under the impact rule, liability for emotional distress due to witnessing injury to a third person exists only when the plaintiff also suffers physical injury from the same force that injured the third person. *See Saechao v. Matsakoun*, 78 Or.App. 340, 717 P.2d 165 (en banc) (adopting impact rule because it provides clear relationship between compensability and the plaintiff's status as a victim of a breach of duty), *rev. dismissed*, 302 Or. 155, 727 P.2d 126 (1986). *But see Gates v. Richardson*, 719 P.2d 193, 195 n. 1 (Wyo.1986) (listing the numerous jurisdictions that have abolished the impact rule). The zone of danger rule would allow recovery if the plaintiff personally was within the zone of danger of physical impact. *See Bovsun v. Sanperi*, 61 N.Y.2d 219, 461 N.E.2d 843, 473 N.Y.S.2d 357 (1984); *see also Restatement (Second) of Torts* § 436 (1965) (endorsing zone of danger rule). The *Bovsun* court held that a plaintiff may recover damages for injuries caused by witnessing serious injury or death of an immediate family member, when the defendant also negligently exposed the plaintiff to the same risk of bodily injury or death. 61 N.Y.2d at 230–31, 461 N.E.2d at 848, 473 N.Y.S.2d at 362.

In rejecting the limitations of both the impact and zone of danger rules, the court in *Dillon v. Legg*, 68 Cal.2d 728, 441 P.2d 912, 69 Cal.Rptr. 72 (1968) (en banc), premised liability for negligent infliction of emotional distress on the foreseeability of the risk of injury. The *Dillon* court developed three factors to determine liability—the plaintiff's proximity to the accident, con-temporaneous observation of the accident, and relationship to the accident victim. *Id.* at 740–41, 441 P.2d at 920, 69 Cal.Rptr. at 80. The standards adopted in *Ramirez* were modeled upon these factors. Since *Ramirez*, at least one jurisdiction has eschewed even the restrictions of *Dillon* and would permit compensation of psychic injury simply on the basis of its reasonable foreseeability. *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983).

The court in *Paugh* also rejected as artificial the requirement that there must be some manifestation of physical injury proximately related to the mental distress in order for the emotional injury to be compensable. The necessity that some sort of physical injury result from the emotional harm has been seen as a mechanism to ensure that the emotional distress is serious enough to be compensable. *See, e.g., Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171 (1982). In rejecting the requirement of physical manifestation, the *Paugh* court, 6 Ohio St.3d at 77, 451 N.E.2d at 765, embraced the reasoning of *Leong v. Takasaki*, 55 Haw. 398, 403, 520 P.2d 758, 762 (1974):

> Because other standards exist to test the authenticity of plaintiff's claim for relief, the requirement of resulting physical injury, like the requirement of physical impact, should not stand as another artificial bar to recovery, but merely be admissible as evidence of the degree of mental or emotional distress suffered.

*Paugh* focused on the seriousness of the emotional distress as a prerequisite for stating a claim for relief. It held emotional injury may be redressed if: (1) it were severe and debilitating, and (2) "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh*, 6 Ohio St.3d at 78, 451 N.E.2d at 765 (citing *Rodrigues v. State*, 52 Haw. 156, 173, 472 P.2d 509, 520 (1970)). In *Binns v. Fredendall*, 32 Ohio St.3d 244, 245, 513 N.E.2d 278, 280 (1987), the Ohio Supreme Court further held that, when the plaintiff also suffered contemporaneous physical injury, negligently inflicted emotional injury "need not be severe

and debilitating in order to be compensable."

Other jurisdictions have declared objective manifestation of physical injury to be an artificial barrier to recovery for negligent infliction of emotional distress. *See, e.g., Molien v. Kaiser Foundation Hosps.,* 27 Cal.3d 916, 616 P.2d 813, 167 Cal.Rptr. 831 (1980) (en banc); *Gammon v. Osteopathic Hosp. of Maine, Inc.,* 534 A.2d 1282 (Me.1987); *Gates,* 719 P.2d at 200. *But see Payton,* 386 Mass. at 546 n. 5, 437 N.E.2d at 175 n. 5 (listing the numerous jurisdictions that require a showing of physical manifestation as a precondition to recovery for emotional distress).

We are convinced the genuineness of such a claim adequately is guaranteed by the threshold requirements that (1) a marital or intimate family relationship existed between the plaintiff and the victim, (2) the severe emotional trauma suffered by the plaintiff was a consequence of contemporaneous sensory perception of the accident, and (3) the victim suffered physical injury or death. *See Ramirez,* 100 N.M. at 541–42, 673 P.2d at 826–27. "It is hard to imagine a mental injury that is more believable than one suffered by a person who witnesses the serious injury or death of a family member." *Gates,* 719 P.2d at 197. In *Ramirez* this Court articulated the interest that was deserving of legal protection when we noted that "[t]he tort of negligent infliction of emotional distress is a tort against the integrity of the family unit." 100 N.M. at 541, 673 P.2d at 825. The prerequisites stated above are sufficient to ensure the legitimacy of a claim that seeks redress for such a tort. *See Gates,* 719 P.2d at 200.

■ As with any negligence action, the plaintiff has the burden to prove damages. Physical manifestation of the emotional trauma would be relevant toward establishing the extent of the injury. *Paugh,* 6 Ohio St.3d at 77, 451 N.E.2d at 765 ("Proof of a resulting physical injury is admissible as evidence of the degree of emotional distress suffered."). However, physical manifestation should not be the sine qua non by which to establish damages resulting from emotional trauma. Modern advances in medical and psychiatric science have eliminated the practical necessity that led to the requirement of evidence of resulting physical injury to validate a claim of emotional distress. *See Gammon,* 534 A.2d at 1284 (" '[T]he state of modern medical science' plus the factors deemed relevant in determining foreseeability provide[ ] sufficient guarantee against fraudulent claims and against undue burden on defendants.") (quoting *Culbert v. Sampson's Supermarkets, Inc.,* 444 A.2d 433, 436–37 (Me.1982)). Moreover, the requirement of physical manifestation is in different cases over-inclusive (allowing recovery for trivial distress if accompanied by physical symptoms) and underinclusive (denying recovery for severe distress if not accompanied by physical symptoms). *Molien,* 27 Cal.3d at 929–30, 616 P.2d at 820, 167 Cal.Rptr. at 838.

> The essential question is one of proof; whether the plaintiff has suffered a serious and compensable injury should not turn on this artificial and often arbitrary classification scheme * * *. [T]he jurors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience * * *. [T]his is a matter of proof to be presented to the trier of fact. The screening of claims on this basis [*i.e.,* resulting physical injury] * * * is a usurpation of the jury's function.

*Id.* at 930–31, 616 P.2d at 821, 167 Cal.Rptr. at 839 (citations omitted).

■ The case at bar amply demonstrates the illogic of requiring as a threshold element the presence of physical injury to manifest the emotional trauma induced by the contemporaneous sensory perception of the death or physical injury of a close loved one. In their motion for directed verdict, defendants maintained that Folz failed to present any evidence of physical manifestation of her emotional injury. Defendants[13] further asserted that, because

---

**13.** This argument actually was made by a party who did not participate in the appeal. How-

Folz received injuries of her own and suffered stress from all of the events following the accident, it was not possible to identify specific physical injury caused by having perceived death or injury to her husband or son. We agree, but we do not conclude that Folz therefore failed to establish the prima facie elements of her claim.

The irony of this case is that Folz satisfies the impact rule allowing recovery by a nonfamily member for emotional distress, i.e., the most narrow standard upon which to base a claim for negligent infliction of emotional distress. Unlike the children in *Ramirez*, who were pure bystanders, Folz was a direct victim of the negligence of the defendants. "As such, the emotional ... injuries which have arisen as a proximate result of the defendant[s'] tortious act are compensable under the traditional rule for recovery. The tortfeasor takes his victim as he finds him, the effect of his tortious act upon the person being the measure of damages." *Binns*, 32 Ohio St.3d at 246, 513 N.E.2d at 280. In denying defendants' motion for directed verdict in this case, then-District Judge Lorenzo Garcia correctly observed that, in effect:

> Where the bystander receives a physical injury, apart from the emotional injury, you have a merging of the evidence, a merging of the issues, and should the court impose such a stringent standard as to require the doctor to say, well, this percent of the emotional injury came from viewing the loss of a loved one, and this percent came from pain and suffering in the accident or physical trauma in the accident, it would place an unreasonable burden on a plaintiff.

■ Nor do we believe it mandatory for the plaintiff to produce expert medical testimony in order to establish the claim for emotional injury. The court of appeals erroneously proceeded on ·the assumption that such testimony is required. Although in many cases expert testimony will be required to establish causation and damages, such testimony is not always neces-

sary. *See Leong*, 55 Haw. at 411–13, 520 P.2d at 766–67 (discussing role of expert). As we stated in *Gerety v. Demers*, 92 N.M. 396, 411, 589 P.2d 180, 195 (1978), "the use of expert medical testimony should be employed when the trial court reasonably decides that it is necessary to properly inform the jurors on the issues."

■ Upon revisiting *Ramirez* we hold, as a threshold requirement to establish the genuineness of a claim for negligent infliction of emotional distress, it is sufficient to allege and prove that (1) the plaintiff and the victim enjoyed a marital or intimate family relationship, (2) the plaintiff suffered severe shock from the contemporaneous sensory perception of the accident, and (3) the accident caused physical injury or death to the victim. When the plaintiff suffers physical injury, apart from the emotional injury, the severe shock from contemporaneous sensory perception involving a family member need not be distinguished from distress attributable to the plaintiff's physical injury. In any event, damages are not recoverable for grief or sorrow normally attending the death of a family member. *See* SCRA 1986, 13–1830.

The testimony of Folz and her physician and the facts and circumstances of this case provided substantial evidence to satisfy each threshold requirement as well as the requisite elements of negligence. Therefore, the trial court properly submitted the claim for resolution by the jury.

For the foregoing reasons, we affirm the court of appeals' application of the "single occurrence" provisions of Section 41–4–19(A)(3) of the Tort Claims Act. We reverse the court on its interpretation of the wrongful death instructions given in this case, and we reverse the court's conclusions regarding Folz' claim for negligent infliction of emotional distress. We remand for entry of judgment consistent with this opinion.

IT IS SO ORDERED.

SOSA, C.J., and BACA, J., concur.

---

ever, defendants here joined in this party's motion during the argument on directed verdict. Consequently, we do not find it inappropriate to

attribute this line of argument to these defendants.

**472**

MONTGOMERY, J., specially concurs.

WILSON, J., dissents in part.

MONTGOMERY, Justice (specially concurring).

I join in the Court's opinion dealing with the single-occurrence and emotional-distress issues. In addition, I concur in the Court's reversal of the court of appeals on the compensatory-damage instruction issue because, as intimated by the majority, the defendants have not shown that they were prejudiced by the trial court's instructions —that, in other words, the jury included, as part of the damage awards to the petitioners for their respective decedents' wrongful deaths, amounts representing punitive or exemplary damages. I disagree, however, that the instruction given in this case, and the Uniform Jury Instruction on wrongful death generally, represent a correct statement of the law. In an appropriate case I would vote to reverse a damage verdict based on that instruction.

UJI 13–1830 instructs the jury that in fixing the amount of damages which it deems fair and just it shall include *compensation* for the following elements of damages proved by the plaintiff: (1) reasonable expenses of necessary medical care and treatment (including funeral and burial expenses); (2) pain and suffering experienced by the decedent between the time of injury and death; (3) the monetary worth the decedent's life; and (4) the mitigating or aggravating circumstances attending the (defendant's) wrongful act, neglect or default. This is an incorrect statement of the law. The plaintiff in a wrongful death case is entitled to compensation for the *losses* resulting from the defendant's acts or omissions; the plaintiff is not entitled to compensation for any mitigating or aggravating circumstances attending those acts or omissions, unless such "compensation" is awarded by way of punitive or exemplary damages. The whole theory of our tort law is to compensate the victim for his or her losses, not (unless punitive damages are awarded) to punish the tortfeasor. *See Restatement (Second) of Torts* § 903 (1977) (damages represent *compensation* for harm sustained by victim); *cf. Freden-*

*burgh v. Allied Van Lines,* 79 N.M. 593, 596, 446 P.2d 868, 871 (1968) (measure of compensatory damages is that which fully and fairly *compensates* for injuries received). This is, or should be, as true for wrongful death actions as it is for other actions founded on negligence, with respect to *all* of which (not just *"sui generis"* claims for wrongful death) our tort law has the dual objectives of compensating victims and deterring negligence. *See Restatement (Second) of Torts, supra,* § 901; W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on Torts* § 4, at 25 (5th ed. 1984). When compensatory damages are assessed these objectives are achieved by measuring the extent of the victim's losses and imposing liability on the tortfeasor for those losses, not by assessing the culpability of the tortfeasor's conduct and adjusting damages up or down depending upon the degree of the tortfeasor's fault.

The purpose of punitive damages, on the other hand, is only to punish the wrongdoer. *Montoya v. Moore,* 77 N.M. 326, 330–31, 422 P.2d 363, 366 (1967); *cf. Fredenburgh,* 79 N.M. at 598, 446 P.2d at 873. This purpose is achieved, in an appropriate case (when there has been the requisite proof of *opprobrious conduct—malicious or willful, wanton, etc., behavior*—and when punitive damages may lawfully be recovered from the tortfeasor), by making it clear that in addition to the sum necessary to compensate the victim for the losses resulting from the tortfeasor's conduct, a separate amount is being assessed by way of punishment and as an example to deter others from such conduct. When there is an appropriate case, the trial judge must determine whether the jury should be permitted to award punitive damages and, if so, he or she must instruct the jury under UJI 13–1827.

In fixing an award of compensatory damages, it makes no sense for the jury to consider the "mitigating circumstances" of the tortfeasor's conduct. The jury's task is to determine the amount of money necessary to make the plaintiff whole (insofar as that can be done by an award of money)

and to fix the compensatory damages accordingly. It does not matter, under our scheme of tort law, that the defendant's conduct is serious or trivial; if the plaintiff has been harmed and the defendant is legally responsible, at least in part, for that harm, the plaintiff is entitled to recover his or her damages. (Of course, if the defendant's conduct is not the sole cause of the harm, his or her liability may be reduced under principles of comparative fault.) The same is true of "aggravating circumstances" attending the tortfeasor's conduct. The plaintiff is entitled to, and required to accept, a determination of the amount of his or her loss; and the aggravation, or lack of it, attending the defendant's conduct is relevant, if at all, only in determining comparative fault and in assessing punitive damages if the trial judge so permits.

I therefore believe UJI 13–1830 should be revised to delete the defendant's "mitigating or aggravating circumstances" as an element of the damages for which a wrongful-death plaintiff is entitled to compensation. Nor should the jury be allowed to "consider" such circumstances in fixing the otherwise proper elements of compensatory damages, as it was in this case. The circumstances surrounding the defendant's conduct, whether mitigating or aggravating, have no place in fixing the amount of the plaintiff's loss.

Our wrongful death act, Section 41–2–3, does not require a different conclusion. Since 1891, the statute has authorized both compensatory and exemplary damages in a wrongful death case. (The legislature made an exception, for wrongful death claims against the state, when it passed the Tort Claims Act and decreed in Section 41–4–19(B) that there could be no exemplary or punitive damages against a governmental entity.) In *Cerrillos Coal R.R. v. Deserant*, 9 N.M. 49, 49 P. 807 (1897), this Court construed the act as follows:

> Neither does the question of mitigating or aggravating circumstances have any weight so far as the damages denominated by our statute "compensatory" are concerned. If there should be a recovery full compensation should be awarded, mitigating or aggravating circumstances having effect only on the question of allowing or not allowing exemplary damages in addition to full compensation.

> Our statute appears to mean, that if there are "aggravating circumstances attending the wrongful act, neglect or default" for which the defendant is responsible, then exemplary damages should be added to those which are merely compensatory.

9 N.M. at 68, 49 P. at 813. Contrary to the majority's reading of the subsequent case law concerning the "mitigating or aggravating circumstances" language in the statute, nothing establishes that this early interpretation of the act was incorrect.

In *Kilkenny v. Kenney*, the only reference to the statutory phrase in question was the following:

> [W]e are of the opinion that the provision in § [41–2–3], which allows a consideration of the mitigating or aggravating circumstances attending the wrongful act, when considered with the language contained in § [41–2–1], warrants the allowance to the administrator of the decedent's damages prior to death, provided they are not the same as those for which the husband, individually, has a right of recovery.

68 N.M. at 270, 361 P.2d at 152. The only issue in *Kilkenny* addressed in this connection, then, was whether or not damages sustained by the decedent between the date of injury and the date of death were recoverable. The Court gave no indication of why or how the statutory phrase "mitigating or aggravating circumstances" bore any relationship to this question; the reference to that phrase in the opinion seems to have been dictum of the purest sort.

Similarly, when the court of appeals said in *Stang v. Hertz Corp.*, 81 N.M. at 78, 463 P.2d at 54, that *Kilkenny* and *Cerrillos* cannot be reconciled in the effect given to the statutory phrase, the court was referring to a conflict that does not exist. *Kilkenny* had indeed held that damages prior to death might be recovered and this did in-

deed conflict with the holding in *Cerrillos* that damages for the decedent's pain and suffering could not be recovered. To that extent *Kilkenny* overruled *Cerrillos sub silentio*, and that disavowal was made express by this Court on appeal in *Stang v. Hertz Corp.*, 81 N.M. at 352, 467 P.2d at 18. But in construing the statutory phrase "mitigating or aggravating circumstances" as superfluous if limited to the conditions for awarding punitive damages, the court of appeals in *Stang* went much further than necessary; its statements on this score are dicta like those in *Kilkenny*, and they were not approved by this Court (except by very oblique inference) on the appeal in *Stang*.

This reading of our wrongful death act is consistent with that in Missouri, where the courts have held that an increase in damages by reason of aggravating circumstances is punitive in nature. *See Wiseman v. Missouri Pac. R.R.*, 575 S.W.2d 742 (Mo.App.1978); *Williams v. Excavating & Foundation Co.*, 230 Mo.App. 973, 93 S.W.2d 123 (1936). As this Court has noted a number of times, our wrongful death act was taken from Missouri, and the views of the Missouri courts are persuasive in interpreting the act. *See Langham v. Beech Aircraft Corp.*, 88 N.M. 516, 520, 543 P.2d 484, 488 (1975) (citing cases); *Cain v. Bowlby*, 114 F.2d 519, 523 (10th Cir.), *cert. denied*, 311 U.S. 710, 61 S.Ct. 319, 35 L.Ed. 462 (1940).

I would thus hold, in an appropriate case, that it is error to permit the jury, in effect, to award punitive damages against the state by considering any aggravating circumstances attending the state's conduct. However, there is no showing that the jury did this in the present case. On the contrary, the instructions the court gave informed the jury with reasonable clarity that it was not to award punitive damages against the state, and there is no indication on this record that the jury nonetheless did so by burying a punitive-damage award in its compensatory-damage determination.

In the first place, the trial court's compensatory-damage instructions modified UJI 13–1830 by authorizing only indisput-ably permissible damage elements: (1) reasonable medical and funeral expenses, (2) pain and suffering of the decedent, and (3) the monetary worth the decedent's life. It is true that the court's instructions went on, incorrectly in my view, to permit the jury to *consider* the aggravating or mitigating circumstances attending the conduct which resulted in the decedent's death. Whether the jury did so or not is purely a matter of conjecture. It was, in any event, instructed that the only allowable elements of damage were those intended to compensate for losses suffered by the decedent or his family. In addition, as the majority opinion notes, the jury was admonished not to award punitive damages against the state. It is presumed that the jury properly followed the court's instructions. *See Ranchers Exploration & Dev. Corp. v. Miles*, 102 N.M. 387, 390, 696 P.2d 475, 478 (1985).

This Court has said that the appellant has the burden of showing he has been prejudiced by an erroneous instruction—that the Court does not correct harmless error. *Jewell v. Seidenberg*, 82 N.M. 120, 124, 477 P.2d 296, 300 (1970); *see also Johnson v. Nickels*, 66 N.M. 181, 183–84, 344 P.2d 697, 699 (1959) (errors not shown to be prejudicial to a substantial right of complaining party will be disregarded). While this rule might not operate unfailingly in all cases, in this case the defendants are asking us to speculate on the effect of the trial court's wrongful-death instruction. The evidence at trial included the following amounts for lost earnings: (1) Sylvester Folz, $390,458.00; (2) Steven Folz, $225,501.00; and (3) Leo Garcia, $263,173.00. The damage awards were, respectively: (1) $206,203.00, (2) $329,107.00, and (3) $500,000.00. In the case of Sylvester Folz, the award was less than the evidence as to loss of earnings. In the cases of Steven Folz and Leo Garcia, while the damage awards exceeded the amounts claimed as lost earnings, significant sums could well have been awarded for other components of each decedent's monetary worth and for the pain and suffering experienced by each, as well as for Steven's medical expenses. We cannot say from the figures alone that the

damage awards exceeded the amounts reasonably allowable as compensation under the court's instructions; we might speculate just as easily that the jury *reduced* its determination of compensatory damages on account of mitigating circumstances. In any event, the defendants have not even attempted to carry their burden to show that the awards were excessive or, if they were, that such excessiveness represented punitive damages.

I therefore conclude that reversible error by the trial court has not been shown and that it was error for the court of appeals to reverse on this ground.

WILSON, Justice, concurring in part and dissenting in part.

I join in the majority opinion with respect to the emotional distress issue. Further, I agree with and adopt Justice Montgomery's special concurrence regarding the uniform jury instruction on damages for wrongful death. I disagree, however, with the majority's determination that the Department's negligent acts and omissions gave rise to a single occurrence.

The term "occurrence" is not defined in the Tort Claims Act, NMSA 1978, Sections 41–4–1 to –27 (Repl.Pamp.1989); we are required, therefore, to interpret it in its ordinary, everyday sense. *See United States v. Mayberry*, 774 F.2d 1018, 1020 (10th Cir.1985) (word to be interpreted in its ordinary, everyday sense if not defined in statute). *Webster's Third New International Dictionary* 1561 (1971) defines "occurrence" as "something that happens unexpectedly and without design." This definition is consistent with the common usage of the words "accident" or "events" as explained in *Saint Paul–Mercury Indem. Co. v. Rutland*, 225 F.2d 689, 691 (5th Cir.1955): "It can hardly be denied that when ordinary people speak of an 'accident' in the usual sense, they are referring to a single, sudden, unintentional occurrence. They normally use the word 'accident' to describe the *event* [emphasis in the original], no matter how many persons or things are involved." *See also Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir.1986) ("occurrence" ordinarily understood to denote something that happens without design or expectation); *but cf. Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1379–1390 (E.D.N.Y. 1988) (policy language reflecting intent of parties included new definition of "occurrence" to provide coverage for gradual, prolonged events that may be excluded by instantaneous connotation of "accident"; court therefore adopted standard for number of "occurrences" that was not result-oriented).

These three terms, "occurrence," "accident," or "event," have been used synonomously by courts dealing with questions of interpretation similar to the issue before us today. *See, e.g., Newmont Mines Ltd.*, 784 F.2d 127, 135 (2d Cir.1986) ("event" and "incident" correctly used interchangeably and synonymously with "occurrence"); *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 910, 350 N.Y.S.2d 895, 899 (1973) ("accident" and "occurrence" synonymous); *Shamblin v. Nationwide Mut. Ins. Co.*, 332 S.E.2d 639, 644 (W.Va.1985) ("occurrence" was the "event," the "collision," or the "accident" from which liability arose). The facts and issues of the present case provide another appropriate context in which to discuss the meaning of these words within the framework of the classic dichotomy between cause and effect.

The majority combines two of the possible approaches suggested by *Hartford Accident*, namely, the proximate cause test and the event test, to create a new definition of occurrence. Its hybrid definition of "single occurrence" is as follows: "[A]ll injuries *proximately caused* by the governmental agency's successive negligent acts or omissions that combined concurrently to create a singular, separate, and unitary risk of harm fell within the meaning of a 'single occurrence' when triggered by the discrete *event* of one runaway truck." (Emphasis added.)

I believe a simpler and more practical approach is to determine whether there has been but "one event of an unfortunate character that takes place without one's

foresight or expectation." *Shamblin*, 332 S.E.2d at 644. Regardless of who or what created the risk of harm, the question is whether there was only one resulting "occurrence"; liability did not arise until there was an event, or in this case, a traffic accident.

In *Shamblin* the insured argued that the two separate acts of negligence by two of its employee-drivers in two of its insured vehicles required a conclusion that there were two "occurrences." The Supreme Court of Appeals of West Virginia disagreed, stating:

> In the case before this Court there may or may not have been two antecedent negligent acts but there was only one resulting "occurrence," the event from which liability arises, namely, the collision. The subject matter of the insurance is not "cause[s]" but "liability" and the basis for liability is an event (the collision) resulting in bodily injury or property damage. "[A]n occurrence means one event, not several events, and the question here is which event is the occurrence contemplated by the policy definition. The cases have consistently construed 'occurrence' or 'accident' in liability policies to mean the event for which the insured becomes liable, and not some antecedent cause of the injury."

*Shamblin*, 332 S.E.2d at 644 (quoting *Champion Int'l Corp. v. Continental Casualty Co.*, 546 F.2d 502, 508 (2d Cir.1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977)). The *Shamblin* court also cited *Hartford Accident* as "[a]nother case equating 'occurrence' with a single liability-triggering 'event,' regardless of the details of how or why the event happened." *Shamblin*, 332 S.E.2d at 644. Quoting *Hartford Accident* with approval, the *Shamblin* court reflected:

> The [*Hartford Accident*] court therein held that there was only one "occurrence," not two occurrences, within the meaning of an automobile liability insurance policy, when an insured vehicle struck one oncoming vehicle and then ricocheted off and struck a second vehicle more than 130 feet away. The court recognized three approaches to determining whether there was one or more than one "occurrence" for liability insurance purposes: (1) looking to the proximate cause of the injuries or damages, (2) looking to the number of persons suffering a loss, and (3) looking to that one event of an unfortunate character that takes place without one's foresight or expectation and which is objectively descriptive of what happened. The court concluded that the third approach was the most practical of the three approaches. In applying this "event" test the court examined the closeness in time of the two impacts (only instants apart) and stated: "We think in common understanding and parlance there was here but a single, inseparable 'three-car accident.'"

*Shamblin*, 332 S.E.2d at 644 (quoting *Hartford Accident*, 33 N.Y.2d at 174, 305 N.E.2d at 910, 350 N.Y.S.2d at 899–900).

In its opinion in the present case the majority concludes that the one event of an unfortunate character which took place without foresight or expectation and which is objectively descriptive of what happened was a runaway truck. While I agree that the runaway truck, as well as the construction operation and the vehicle escort procedure, caused the accident, none of these circumstances alone was the event from which the liability arose nor are they objectively descriptive of what happened. Instead, I am convinced by the analysis in the *Shamblin* case that, despite the many antecedent causes, the resulting occurrence from which liability arose was the collision or the traffic accident.

In determining whether there was a single accident (occurrence) or a series of accidents (occurrences), it is appropriate and helpful to examine the anatomy of a traffic accident. Fortunately, we have the benefit of a great body of knowledge from the study and experience of experts in this field. Authorities agree that a traffic accident may be broken down into at least four segments as follows: (1) point of perception; (2) period of evasion; (3) point of no escape; and (4) point of impact (first contact). The point of perception occurs when

a driver perceives that an accident is imminent. The period of evasion is that period of time when the driver takes evasive action to avoid the accident. The point of no escape is that point reached when evasive tactics are superfluous and an accident is unavoidable. The point of first impact, or first contact, is when the vehicle or vehicles actually collide. *See* J. Baker & L. Fricke, *The Traffic–Accident Investigation Manual* 15–26 (9th ed. 1986).

By analyzing an accident through its various segments, it is possible to determine whether an accident was a single occurrence with its segments identical or whether the accident was a series of occurrences with its segments separate and distinct. Two comparative hypotheticals are illustrative.

Assume that an obstruction blocks the traffic lane of a highway. Driver A approaches the obstruction and stops in the traffic lane; Driver B approaches and stops behind Driver A. Driver C approaches, is unable to stop, and crashes into Driver B. Driver B is carried forward into Driver A; Driver A is carried forward into the obstruction. In this hypothetical, the only point of perception is the point of time at which Driver C perceives that a collision is imminent. Drivers A and B may not perceive any danger at all. The period of evasion is when Driver C attempts to stop or avoid colliding with Driver B. Neither Driver A nor Driver B may be in positions to take evasive action as they are already stopped by the obstruction. The point of no escape is that point of time when Driver C cannot stop or turn and collides with Driver B. This point is, effectively, the same for all of the drivers and vehicles as the impacts are, for all intents and purposes, simultaneous, overlapping, or otherwise indistinguishable. From my analysis, this was a single accident or occurrence.

Assume, however, that Driver A approaches the obstruction and crashes into it. Driver B approaches and crashes into Driver A. Driver C now approaches and crashes into Driver B. In this hypothetical, the point of perception is the point of time that each individual driver sees that the

highway is obstructed and a collision is imminent. The period of evasion for each driver is when each is attempting to stop or avoid the collision. The point of no escape for each driver is that point of time when each cannot avoid a collision. Likewise, the impacts are clearly separate and distinct. From my analysis, the second hypothetical was a series of distinguishable accidents or occurrences.

The task now is to determine whether the accident in the case before us more closely fits the first hypothetical or the second. Conveniently, the accident under discussion is an excellent example to make this analysis. The runaway truck came downhill in the westbound lane where a series of cars had stopped at the construction site. Had the truck collided into the rear car causing an accordion-type crash, this accident, like the first hypothetical, would meet the criteria for a single occurrence. However, the runaway truck managed to pass the cars stopped in the westbound lane and continued on to sideswipe an oncoming vehicle which was attempting to regain the eastbound lane. The truck then continued downhill, striking three other vehicles before colliding with a construction vehicle which burst into flames. Each of the five vehicles involved in the collisions had different points of perception, had varying periods of evasion, had successive points of no escape, and had separate and distinguishable points of impact.

For the reasons stated above, I respectfully dissent from the majority's definition of "single occurrence" as used in Section 41–4–19(A)(3) of the Tort Claims Act.