918 P.2d 1321

Andrea CUMMINGS, Plaintiff–Appellant,

v.

X–RAY ASSOCIATES OF NEW MEXICO, P.C., Defendant–Appellee.

No. 22246.

Supreme Court of New Mexico.

May 31, 1996.

Rehearing Denied June 20, 1996.

Durkovich & Martinez, Kevin Martinez, Albuquerque, NM, for Appellant.

Miller, Stratvert, Torgerson & Schlenker, P.A., Gregory Chase, Alice Tomlinson Lorenz, Ruth O. Pregenzer, Albuquerque, NM, for Appellee.

## *OPINION*

FRANCHINI, Justice.

1. This case concerns the proper interpretation of Section 41–5–13 from the Medical Malpractice Act, NMSA 1978, §§ 41–5–1 to –29 (Repl.Pamp.1989 & Cum.Supp.1995), which requires a claim for medical malpractice be "filed within three years after the date that the act of malpractice occurred." Andrea Cummings filed a malpractice claim against X–Ray Associates for failing to properly diagnose a cancerous mass in her lung. We conclude that the limitation period in Section 41–5–13 is constitutional and that Cummings' malpractice claim is barred by the statutory three-year limit.

## I. FACTS

2. In 1986 Cummings was hired as a nurse by Heights General Hospital [hereinaf-

ter Hospital]. She was required by the Hospital to undergo a pre-employment physical, which included a chest x-ray performed by X–Ray Associates. The radiology report, dated February 17, 1986, showed a mass in her left lung. The radiologists at X–Ray Associates interpreted the mass as a probable "arteriovenous malformation" known as an AVM. A pulmonary AVM is an "abnormal passageway between an artery and vein that occurs in the blood vessels of the lungs." Applied Medical Informatics, Inc., *Medical HouseCall on the Net,* http://www.ami-med.com/mhc/top/001090.htm (Internet 1996). Cummings was told that the AVM was akin to an internal birthmark and was harmless.

3. Cummings had a follow up CT-scan at the Hospital the following June which revealed the lung mass as well as a mass on her right kidney that had not been detected by the radiologists at X–Ray Associates. In a report dated June 16, 1986, the lung mass in the CT-scan was described as a probable AVM.

4. About two years later, on August 10, 1988, Cummings had routine pre-operative chest x-ray prior to undergoing surgery for a hysterectomy. The x-ray apparently was performed once again by X–Ray Associates. As before, the x-ray revealed the mass in her lung, and the radiologist sought to have this x-ray compared with prior x-rays. Unfortunately, the previous x-ray reports had been misfiled by the Hospital. The radiologist evidently accepted Cummings' word that the mass was an AVM.

5. About a year and a half later, on January 17, 1990, Cummings underwent kidney and gallbladder surgery. The pre- and post-operation medical reports indicated that the masses on her lung and kidney needed further investigation.

6. On February 23, 1990, a medical report was issued finding that the masses on her lung and kidney were cancer. This was Cummings' first indication that the AVM diagnosis was completely erroneous. The cancer was surgically removed along with the left upper lobe of her lung and her right kidney on March 6, 1990. Subsequent testing and examination suggested that the cancer had not spread to other parts of her body, a phenomenon known as metastasis. Her physician stated, however, he could give her no guarantees that the cancer had not metastasized.

7. Further examinations over the next two years revealed no metastasis until a medical report dated January 8, 1992, revealed the discovery of tissue abnormalities. About January 24, Cummings' physicians determined that the lung cancer had metastasized. The spread of the cancer portended an extremely bleak prognosis for Cummings.

8. About six months later, on July 13 and July 27, 1992, Cummings filed malpractice claims against the Hospital and its various corporate affiliates for the injuries she suffered as a result of the metastases of the lung cancer. X–Ray Associates was first brought into the lawsuit on November 9, 1992, by a third party complaint filed by one of the Hospital's affiliates. Another year passed before Cummings filed her own separate complaint for malpractice against X–Ray Associates, on December 7, 1993. At a hearing on April 18, 1994, the district court ruled that Cummings' complaint against X–Ray Associates was barred by the three-year "statute of limitations" in Section 41–5–13. An order dismissing Cummings' complaint against X–Ray Associates was issued April 25.

9. Cummings appealed, and the Court of Appeals certified her case to this Court. We address two issues: First, is the three-year time limit of Section 41–5–13 constitutional; and second, if it is, does that statute bar Cummings' complaint against X–Ray Associates? We answer both issues affirmatively. The trial court's order dismissing Cummings' complaint is therefore affirmed.

## II. STATUTE IN QUESTION

10. The Medical Malpractice Act limits to three years the time in which a malpractice claim may be filed:

No claim for malpractice arising out of an act of malpractice which occurred subsequent to the effective date of the Medical Malpractice Act may be brought against a health care provider *unless filed within three years after the date that the act of malpractice occurred* except that a minor under the full age of six years shall have until his ninth birthday in which to file. This subsection applies to all persons regardless of minority vor [sic] other legal disability.

Section 41–5–13 (emphasis added).

11. X–Ray Associates argues that the most recent of its alleged acts of malpractice occurred on August 10, 1988, the last time it examined Cummings. It asserts that the plain meaning of the statutory language dictates that Cummings should have filed her claim within three years of that date, by August 10, 1991. However, she filed no claim for malpractice until almost four years after the 1988 x-rays, in July 1992. Moreover, she did not personally sue X–Ray Associates until December 1993, more than five years after the 1988 examination. Additionally, X–Ray Associates suggests that Cummings knew she had been misdiagnosed within a year-and-a-half of the 1988 examination, because she learned in February 1990 that the mass in her lung was cancer. She therefore knew of her injury before the three-year limit of Section 41–5–13 had expired, and yet failed to take advantage of the opportunity to file a malpractice claim.

12. Cummings asserts that her cause of action for medical malpractice did not accrue until January 24, 1992, the date she learned the cancer had metastasized. Thus, she argues that her complaint against X–Ray Associates on December 7, 1993, was filed within the three-year limit of Section 41–5–13.

13. Cummings urges a broad interpretation of the phrase "the date that the act of malpractice occurred" from Section 41–5–13. She defines an "occurrence" as a continuum beginning with the act of malpractice and ending with the resulting injury. She argues that the "occurrence," so defined, is the unit of harm for which the Act authorizes recovery.

14. She bolsters this concept of "occurrence" by attempting to draw an identity between an "act of malpractice" in the above-quoted phrase from Section 41–5–13, and a "malpractice claim" defined in Section 41–5–3(C): " *'malpractice claim'* includes *any cause of action* arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care *which proximately results in injury to the patient....*" Section 41–5–3(C) (emphasis added). She claims that this statutory language means that a single "occurrence" for which a patient may raise a "malpractice claim" includes both the negligent act and the proximately resulting injury. She argues that until there has been a complete "occurrence," there can be no "malpractice claim."

15. In Cummings' view, the negligent act in this case was the *misdiagnoses* of the lung mass as an AVM in 1986 and 1988. The resulting injury was the metastasis of the cancer. Because there was no medically detectable metastasis until January 24, 1992, Cummings argues she suffered no injury until that date. In Cummings' view, the "occurrence" lasted from the first misinterpretation of the x-ray through the discovery of metastasis; she thus had no cause of action until 1992.

16. She further claims she suffered no injury when her doctors first discovered the cancer in 1990, because the cancer was already present in her system before the misdiagnosis in 1986. She acknowledges that X–Ray Associates did not cause her cancer. Rather, she argues that its actions allowed the cancer to metastasize, an injury that did not appear until 1992.

## III. THE MEDICAL MALPRACTICE STATUTE OF REPOSE IS CONSTITUTIONAL

17. Cummings argues that Section 41–5–13 is unconstitutional if its plain meaning

must be construed so as to bar a medical malpractice claim before it accrues. She alleges that this statutory time limit creates an unreasonable classification in violation of the constitutional right to equal protection, and that it violates the constitutional due process right of access to the courts. *See* U.S. Const. amends. V & XIV, § 1; N.M. Const. art. II, § 18 (Repl.Pamp.1992).

### A. Standard of Review

■ 18. In *Marrujo v. New Mexico State Highway Transportation Department,* 118 N.M. 753, 756–58, 887 P.2d 747, 750–52 (1994), we explained the traditional three-tiered standard of review adopted by most U.S. courts in assessing facial constitutional challenges: "strict scrutiny; intermediate scrutiny (also known as substantial, heightened, or high review); and minimal scrutiny (also known as the rational[-]basis test)." *Id.* at 757, 887 P.2d at 751. Cummings urges that we evaluate this statute under a strict-scrutiny standard of constitutional review.

Strict scrutiny applies when the violated interest is a fundamental personal right or civil liberty—such as first amendment rights, freedom of association, voting, interstate travel, privacy, and fairness in the deprivation of life, liberty or property—which the Constitution explicitly or implicitly guarantees. Strict scrutiny also applies under an equal protection analysis if the statute focuses upon inherently suspect classifications such as race, national origin, religion, or status as a resident alien.

*Id.* (citations omitted).

■ 19. X–Ray Associates urges that we evaluate the constitutionality of Section 41–5–13 using minimal scrutiny, usually called the rational-basis standard. "The rational basis standard of review is triggered by 'all other' interests" that are not addressed by the strict and intermediate levels of review. *Id.*

This level of scrutiny applies in economic and social legislation, classifications based on property use, and business and personal activities that do not involve fundamental rights.... Under this test, the burden is on the opponent of the legislation to prove that the law lacks a reasonable relationship to a legitimate governmental purpose.

*Id.* at 757–58, 887 P.2d at 751–52 (citations omitted). Both parties agree that intermediate scrutiny is not applicable to this case. *See Id.* at 757, 887 P.2d at 751 (defining intermediate scrutiny).

■ 20. New Mexico courts have repeatedly analyzed statutes of limitation and statutes of repose under the rational-basis test. *See, e.g., Coleman v. United Eng'rs & Constructors, Inc.,* 118 N.M. 47, 51, 878 P.2d 996, 1000 (1994) ("We hold that rational basis scrutiny, rather than intermediate scrutiny, applies to assess the constitutionality of [the statute of repose for unsafe physical improvements to real property]."); *Espanola Hous. Auth. v. Atencio,* 90 N.M. 787, 789, 568 P.2d 1233, 1235 (1977) [hereinafter *Atencio* ] (rational basis applied to statutory scheme that provided shorter limitations period for personal injury suits against municipalities than suits against states and counties). In fact, both this Court and the Court of Appeals have previously applied the rational-basis test in upholding the limitation statute at issue in this case. *See Garcia ex rel. Garcia v. La Farge,* 119 N.M. 532, 539, 893 P.2d 428, 435 (1995) (determining if the classification by Section 41–5–13 of health care providers differently from other tortfeasors is supported by a rational basis); *Armijo v. Tandysh,* 98 N.M. 181, 183, 646 P.2d 1245, 1247 (Ct.App.1981) ("The Legislature had a rational basis for providing, in [Section 41–5–13] a specific limitation period for malpractice claims against health care providers."), *cert. quashed,* 98 N.M. 336, 648 P.2d 794 (1982), *and cert. denied,* 459 U.S. 1016, 103 S.Ct. 377, 74 L.Ed.2d 510 (1982), *and overruled on other grounds by Roberts v. Southwest Community Health Servs.,* 114 N.M. 248, 251–54, 837 P.2d 442, 445–48 (1992).

■ 21. For the reasons we present below, we conclude that the rational-basis test continues to be appropriate for constitutional

challenges to Section 41–5–13. Thus Cummings will bear the burden of proving that the time limit of Section 41–5–13 lacks any rational relationship to a legitimate government interest. *See Marrujo,* 118 N.M. at 760, 887 P.2d at 754. We will uphold the constitutionality of the statute if we find it reasonably functions to further a legitimate government interest. Under the rational-basis standard, even a single persuasive rationale may be sufficient to establish the statute's constitutionality. *Id.*

## B. Equal Protection

■ 22. The constitutional right to equal protection concerns whether the legislature may afford a legal right to some individuals while denying it to others who are similarly situated. *Garcia,* 119 N.M. at 537, 893 P.2d at 433; *Marrujo,* 118 N.M. at 757, 887 P.2d at 751. Cummings claims that the interpretation of Section 41–5–13 urged by X–Ray Associates in combination with an exception to that statute set out in one of our previous opinions would create an unconstitutional classification. X–Ray Associates argues that Section 41–5–13 bars recovery to patients whose injuries appear three years after the date of the act of medical malpractice. The exception to this rule, to which Cummings alluded, was established by *Roberts v. Southwest Community Health Services,* 114 N.M. 248, 254, 837 P.2d 442, 448 (1992): The Medical Malpractice Act permits health care providers to become "qualified" by submitting to certain regulatory requirements such as filing proof of malpractice insurance coverage that meets specific monitory minimums. *See* § 41–5–5. In *Roberts* we concluded that if the malpractice was performed by a *non-*qualified health care provider, the patient's right to bring a cause of action is tolled from the discovery of the injury, rather than from the act of malpractice. *Roberts,* 114 N.M. at 254, 837 P.2d at 448. Cummings claims that if the interpretation urged by X–Ray Associates and the holding in *Roberts* are both applied, the Act unconstitutionally singles out a specific class of malpractice victims: patients suffering from latent injuries inflicted by qualified health care providers.

23. We find it useful to divide Cummings' equal protection objection into two separate claims. The first claim concerns the classification of health care providers. She contends that the legislature could not constitutionally devise a scheme in which a patient who was treated by a qualified health care provider has less opportunity for malpractice recovery than one who was treated by a non-qualified health care provider. Cummings' second equal protection claim concerns the classification of patients. She argues that the legislature unconstitutionally distinguishes between injuries that are latent for more than three years and those that manifest sooner.

24. It is apparent at the outset that Cummings' equal protection argument does not concern an inherently suspect classification as required by strict-scrutiny analysis. The class of "patients suffering from latent injuries inflicted by qualified health care providers" is not of the same constitutional order as classifications based upon "race, national origin, religion, or status as a resident alien." *See Marrujo,* 118 N.M. at 757, 887 P.2d at 751. Strict-scrutiny analysis is not appropriate for this equal protection claim.

■ 25. Rather, the classification she delineates—acts of malpractice by qualified versus non-qualified health care providers—is a mere administrative categorization. It is a class defined by economic and bureaucratic distinctions that are far removed from racial, religious, or other fundamental categories. The rational-basis test is applied to legislation directed toward business, social, and financial activities as well as to the type of categorization alleged in this case. *See Id.* at 757–58, 887 P.2d at 751–52.

■ 26. We find that the first equal protection objection raised by Cummings, concerning the classification of health care providers, is supported by a rational basis. Cummings mischaracterizes the distinction she makes between acts of malpractice performed by qualified as opposed to non-qualified health care providers. This is not, as

she suggests, a classification based upon the character of plaintiff-patients. As we stated in *Garcia*, 119 N.M. at 538, 893 P.2d at 434, it is a classification based upon the character of defendant-health-care-providers. "While such a classification may be challenged on equal protection grounds by other tortfeasors or by nonqualified health care providers, it does not implicate the equal protection rights of medical malpractice plaintiffs." *Garcia*, 119 N.M. at 538, 893 P.2d at 434. Since, in this case, Cummings is not acting as a health care provider, she has no standing to raise an equal protection objection to this classification.

27. There is nothing unconstitutional in granting a more favorable statute of repose to qualified health care providers than that offered to those who are non-qualified. Such a policy has a strong rational basis. The express "purpose of the Medical Malpractice Act ... is to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico." Section 41–5–2. In order to achieve such a legislative goal, a statutory scheme will often offer certain benefits to a specific group in exchange for compliance by that group with the requirements of a regulatory system. This quid pro quo is a common arrangement between a governmental regulatory agency and the entities that it regulates.

■ 28. The bureaucratic burdens of complying with a regulatory scheme are usually significant and can be costly. The burdens of qualification under the Medical Malpractice Act include proof by the health care providers of insurance coverage of $200,000 per occurrence. Section 41–5–5(A)(1); *see Garcia*, 119 N.M. at 539, 893 P.2d at 435. Any judgment or settlement that awards an amount greater than $200,000 is paid from a special fund called the "patient's compensation fund." Section 41–5–6(D). Qualified health care providers must pay an annual surcharge in order to maintain the patient's compensation fund. Section 41–5–5(A)(2); Section 41–5–25. It is this surcharge that

assures the solvency of the fund regardless of the number of claims made on the fund's resources. *See Garcia*, 119 N.M. at 539, 893 P.2d at 435. By establishing minimum levels of insurance and levying a surcharge to sustain the patient's compensation fund, the Medical Malpractice Act achieves the legislative purposes of assuring that health care providers are adequately insured so that patients may be reasonably compensated for their malpractice injuries. *See* Section 41–5–2.

29. The legislature provided a number of incentives to assure participation by health care providers in the burdens of qualification under the Medical Malpractice Act. *See Garcia*, 119 N.M. at 539, 893 P.2d at 435 (listing several benefits); *Roberts*, 114 N.M. at 251–52, 837 P.2d at 445–46 (listing several benefits). The most notable benefit of qualification for the purposes of this case was the specific decision by the legislature "to insulate qualified health care providers from the much greater liability exposure that would flow from a discovery-based accrual date." *Roberts*, 114 N.M. at 252, 837 P.2d at 446; *see* Section 41–5–13. These benefits are expressly denied to health care providers who do not qualify. Section 41–5–5(C).

■ 30. Thus by offering to qualified health care providers certain benefits that are not available to those who are not qualified, the legislature furthers its stated goal of assuring adequate malpractice insurance coverage in the New Mexico medical profession.

> Equal protection does not prohibit classification for legislative purposes, provided that there is a rational and natural basis therefor, that it is based on a substantial difference between those to whom it does and those to whom it does not apply, and that it is so framed as to embrace equally all who may be in like circumstances and situations.

*Gruschus v. Bureau of Revenue*, 74 N.M. 775, 778, 399 P.2d 105, 107 (1965). Cummings' first equal protection claim fails because Section 41–5–13 was reasonably drafted to further a legitimate government interest.

31. Cummings' second equal protection objection concerns the effect of Section 41–5–13 on two classes of patients. In this statute the legislature does distinguish between injuries that manifest themselves within a three-year period and those that do not become apparent until after three years has passed. Though this distinction raises equal protection issues, the preclusion of those with latent injuries from bringing a malpractice claim also implicates Cummings' due process argument that such patients are being denied access to the courts. The rationale for distinguishing between latent and non-latent injuries will be explained in the following due process discussion.

## C. Due Process

■ 32. While equal protection concerns legislation that denies a specific right to certain individuals at the same time it grants the right to others, the constitutional guarantee of due process concerns "the validity of legislation as it equally burdens all persons in the exercise of a specific right." *Marrujo*, 118 N.M. at 757, 887 P.2d at 751. Cummings argues that if Section 41–5–13 accrues at the time of the act of malpractice, her due process rights of access to the courts are violated. She states that a patient may suffer a legitimate injury caused by a verifiable act of malpractice and would nevertheless be barred from legal recovery if the three-year limit runs before the injury becomes evident.

■ 33. Cummings argues that she has a fundamental right of access to the courts to bring her malpractice claim. She contends that a limitation of that right implicates due process rights and must be analyzed under the strict scrutiny test. However, where there is no cause of action, a plaintiff cannot claim they have been denied access to the courts. And if they have no right of access to the courts, they cannot claim to have been denied due process. The statute of repose of the Medical Malpractice Act forecloses any cause of action that does not accrue within three years of the act of malpractice. A plaintiff has no expectancy of a cause of action that has been legitimately denied by the legislature before it accrues. If the cause of action has been legitimately foreclosed, the medical malpractice plaintiff cannot allege a denial of any right of access to the courts. "Access to the courts" is not a due-process question applicable to one who, as with all others similarly situated, has no recognized cause of action by reason of a valid statute of repose. Since no right has accrued, it is moot to question whether there has been a denial of a fundamental right to vindicate that right in court.

34. However, on a more fundamental level, Cummings is challenging the constitutionality of the three-year limitation itself. As mentioned above, we ordinarily evaluate statutes of limitation and repose under the rational basis test. *See, e.g., Coleman*, 118 N.M. at 51, 878 P.2d at 1000. Cummings is suggesting a contrary argument that we should review the constitutionality of any statute of limitations or repose under the strict scrutiny test. This is warranted, under Cummings' line of reasoning, because any such statute will ultimately deprive some plaintiffs of access to the courts which, according to Cummings, is a fundamental right.

■ 35. Contrary to Cummings' suggestion, access to the courts does not always implicate fundamental rights. *See Jaramillo v. State*, 111 N.M. 722, 725, 809 P.2d 636, 639 (Ct.App.) ("[W]e find nothing that specifically indicates that purely procedural matters impinging on the right of access to the courts must be analyzed under the heightened scrutiny analysis."), *cert. denied*, 111 N.M. 416, 806 P.2d 65 (1991). The level of scrutiny to which an access-to-the-courts claim is raised depends upon the nature of the interest that is affected when a court hearing is denied. Before "strict scrutiny is applied, the right that plaintiffs seek to vindicate by access to the courts must be a fundamental right." *Wayne v. Tennessee Valley Auth.*, 730 F.2d 392, 403 n. 9 (5th Cir.1984), *cert. denied*, 469 U.S. 1159, 105 S.Ct. 908, 83 L.Ed.2d 922 (1985). For example, in a criminal setting,

the state seeks to deprive the defendant of the fundamental rights of life and liberty. Access to the courts for the criminal defendant is thus a fundamental right. *See Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). Any move to deny a trial to a criminal defendant would have to endure the strictest constitutional scrutiny. On the other hand, many, if not most, civil actions do not involve the plaintiff's fundamental rights. Under such circumstances, the plaintiff's right of access to the courts is not fundamental. In a civil setting, the right of access to the courts is not guaranteed at any time under all circumstances. *Cf.* Laurence H. Tribe, *American Constitutional Law* § 10–18, at 753 (2d ed.1988) (suggesting that there is no consensus that access to the courts is a fundamental right in all civil settings).

■■■ 36. A medical malpractice claim is not an attempt to recover an accrued or vested interest that has been taken away; the patient cannot reasonably expect the restoration of his or her health. A malpractice claim is an attempt by a patient to obtain something he or she does not yet possess: monetary compensation for an injury caused by the negligence of a health care practitioner. As such, a medical malpractice claim generally does not, for the patient, implicate any fundamental rights "such as first amendment rights, freedom of association, voting, interstate travel, privacy, and fairness in the deprivation of life, liberty or property." *Marrujo,* 118 N.M. at 757, 887 P.2d at 751. Though Cummings has a right to seek recovery, no fundamental rights are at stake. Therefore, the constitutionality of the statute of repose, which serves to cut off her right to seek recovery, will not be evaluated under the strict-scrutiny test. As with her equal protection argument, this due process claim requires only a rational-basis analysis.

■■■ 37. Applying a rational-basis standard, we reject Cummings' broad argument that Section 41–5–13 unconstitutionally deprives her of access to the courts. If we were to adopt her line of reasoning then all statutes of limitation and repose would be unconstitutional. *See Wayne,* 730 F.2d at 403 ("If appellants' due process argument were valid, every filing fee and filing deadline, as well as every statute of limitations, would have to be justified by a compelling state interest since failure to comply with them would result in a restriction on a plaintiff's access to the courts."). There is no statute of limitations that does not prevent some identifiable class from litigating its cause of action. Such a class is always characterized by the fact that its members failed to timely pursue their claim. Whether this failure is through careless negligence or innocent lack of information is generally irrelevant to the constitutionality of the time limit.

> [Statutes of limitation] are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of the individual. [The individual] may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

*Chase Sec. Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945) (footnote omitted).

38. Medical injuries sometimes do not become apparent for decades. An unduly long statute of repose, or a limit based upon a discovery-based accrual date would place an unfair burden upon the medical profession. Claims could arise long after memories have faded, parties become unavailable, and evidence is lost. *See Douglas ex rel. Douglas v. Hugh A. Stallings, M.D., Inc.,* 870 F.2d 1242, 1248 (7th Cir.1989). There must be a date that the cause of action expires. It is unavoidable that some individuals will be barred from recovery no matter what termi-

nation point the legislature selects. A particular law is not rendered unreasonable or unconstitutional merely because its results are sometimes harsh. *Hargraves v. Brackett Stripping Mach. Co.*, 317 F.Supp. 676, 683 (E.D.Tenn.1970).

39. We conclude that the three-year time limit of Section 41–5–13 establishes a reasonable termination point for medical malpractice claims. There is evidence to suggest that only a small percentage of medical malpractice claimants are affected if the claim is time-barred three years after the act of malpractice. *See* Scott A. DeVries, *Medical Malpractice Acts' Statutes of Limitation as They Apply to Minors: Are They Proper?*, 28 Ind.L.Rev. 413, 415 (1995) (discussing a survey suggesting three-year occurrence-based rule would time-bar ten percent of malpractice claims).

40. Moreover, though some patients may not be able to bring their cause of action to trial, this statute of repose is reasonably related to important governmental interests. Like many other states, New Mexico reformed its medical malpractice laws in 1976 in response to a much discussed medical malpractice crisis. *Roberts*, 114 N.M. at 249, 837 P.2d at 443; *Wilschinsky v. Medina*, 108 N.M. 511, 516, 775 P.2d 713, 718 (1989); *see also* 1976 N.M. Laws, ch. 2, §§ 1 to 32. We acknowledge that more recently, this crisis is described as a *"perceived* medical malpractice crisis." *Roberts*, 114 N.M. at 249, 252, 837 P.2d at 443, 446 (emphasis added). "The validity and severity of this medical malpractice insurance crisis of the 1970's as well as the effectiveness of the legislation enacted in response to it has been disputed." Christopher J. Trombetta, *The Unconstitutionality of Medical Malpractice Statutes of Repose: Judicial Conscience Versus Legislative Will*, 34 Vill.L.Rev. 389, 406 (1989) (footnotes omitted). Nevertheless, when employing the rational-basis test, courts will not consider the controversies surrounding the academic examination of legislative policy. *Cf. Richardson v. Carnegie Library Restaurant, Inc.*, 107 N.M. 688, 693,

763 P.2d 1153, 1158 (1988) (stating that when minimal scrutiny is applied, courts will not inquire into policy). The New Mexico legislature apparently concluded that the potential for a malpractice suit being filed long after the act of malpractice was one of the reasons that insurance carriers were withdrawing from medical malpractice liability coverage. The legislature's solution—rationally related to alleviating this problem—was to preclude almost all malpractice claims from being brought more than three years after the act of malpractice.

41. The three-year limit of Section 41–5–13 is also supported by the same arguments that provide a rational basis for other statutes of limitation and repose. As mentioned above, a statute of repose based upon the date the injury is discovered could place the medical profession in the unfair position of litigating stale claims, years and even decades after the act of malpractice. *Jaramillo*, 111 N.M. at 725, 809 P.2d at 639. The limitations period also encourages the patient, once the injury has been discovered, to diligently pursue his or her claim. As we will discuss in the following section, Cummings' error in this case is that she did not take advantage, after her cancer was discovered on February 23, 1990, of the remaining year-and-a-half provided by Section 41–5–13 in which to pursue her claim.

42. Both this Court and the Court of Appeals have previously found that Section 41–5–13 violates neither the equal protection nor the due process constitutional guarantees. *See Garcia*, 119 N.M. at 539, 893 P.2d at 435 (finding Section 41–5–13 to be constitutional); *Jiron v. Mahlab*, 99 N.M. 425, 427, 659 P.2d 311, 313 (1983) (stating that in most circumstances Section 41–5–13 is constitutional); *Kern ex rel. Kern v. St. Joseph Hosp., Inc.*, 102 N.M. 452, 455, 697 P.2d 135, 138 (1985) (finding Section 41–5–13 to be constitutional). Though Section 41–5–13 may in some situations seem harsh, it is constitutional.

## IV. THE STATUTE OF REPOSE FOR BRINGING A MALPRACTICE CLAIM CAN EXPIRE BEFORE ANY INJURY IS DISCOVERED

43. Having established the constitutionality of Section 41–5–13, we will now address

whether Cummings' malpractice claim is time-barred by this statute.

## A. Standard of Review

44. When interpreting statutes, our responsibility is to search for and give effect to the intent of the legislature. We endeavor to fulfill the statute's objectives. *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994). Our understanding of legislative intent is based primarily on the language of the statute, and we will first consider and apply the plain meaning of such language. *Roberts,* 114 N.M. at 251, 837 P.2d at 445. This standard is sometimes called the "plain meaning rule."

45. Cummings urges us to keep in mind certain limitations to this rule because the plain meaning of Section 41–5–13 more easily supports the conclusion urged by X–Ray Associates. Cummings is correct in pointing out that this rule does not require a mechanical, literal interpretation of the statutory language. *See D'Avignon v. Graham,* 113 N.M. 129, 131, 823 P.2d 929, 931 (Ct.App. 1991). It is rare, if not impossible, for any language—statutory or otherwise—to be utterly free from ambiguity. *See Helman,* 117 N.M. at 353, 871 P.2d at 1359. We will not rest our conclusions upon the plain meaning of the language if the intention of the legislature suggests a meaning different from that suggested by the literal language of the law. *Draper v. Mountain States Mut. Casualty Co.,* 116 N.M. 775, 777, 867 P.2d 1157, 1159 (1994). If the strict wording of the law suggests an absurd result, we may interpret the statute to avoid such a result. *State v. Gutierrez,* 115 N.M. 551, 552, 854 P.2d 878, 879 (Ct.App.1993), *cert. denied,* 115 N.M. 545, 854 P.2d 872 (1993). When analyzing a statute from a particular statutory act, such as the one we now discuss from the Medical Malpractice Act, we must read the act in its entirety and construe all the provisions together and attempt to view them as a harmonious whole. *See Roberts,* 114 N.M. at 251, 837 P.2d at 445. The plain meaning of particular statutory language will sometimes be

modified when considered in the context of other statutes from the same act. However, "[i]f the language of a statute is not ambiguous, the literal meaning of the words must be applied." *Kern,* 102 N.M. at 455, 697 P.2d at 138.

46. As we have stated in other opinions, and as we explain below, we do not find any reason in this case to depart from the plain meaning of Section 41–5–13 in construing its language.

## B. The Discovery Rule and the Occurrence Rule

47. Two basic standards determine the beginning of the time period in which a patient must file a claim for medical malpractice. One is sometimes called the "discovery rule." The time period under this rule does not begin to run until the patient discovers, or reasonably should discover, the essential facts of his or her cause of action. This discovery date may be the patient's first subjective awareness that something is wrong—the first feelings of pain or discomfort. The discovery date may also be the first objective confirmation through medical diagnosis that previous medical care was improper. The other standard is sometimes called the "occurrence rule." This rule fixes the accrual date at the time of the act of medical malpractice even though the patient may be oblivious of any harm. *Cf. Roberts,* 114 N.M. at 250 n. 3, 837 P.2d at 444 n. 3 (discussing rules based upon discovery and occurrence).

48. Section 41–5–13 requires a medical malpractice claim to be "filed within three years after the date that the act of malpractice occurred." The plain meaning of this language demonstrates that the legislature intended the occurrence rule to govern the Medical Malpractice Act. This is because, as applied to this case, Section 41–5–13 operates as a statute of repose rather than as a statute of limitations. *See Garcia,* 119 N.M. at 537, 893 P.2d at 433.

49. A statute of limitations establishes the time, after a cause of action arises,

within which a claim must be filed. DeVries, *supra*, at 415. A statute of limitations begins to run when the cause of action accrues, the accrual date usually being the date of discovery. *Garcia*, 119 N.M. at 537, 893 P.2d at 433. In this sense, if a patient discovers they have been injured within a year of the act of malpractice, then Section 41–5–13 operates as a statute of limitations, requiring a claim be filed within the next two years or the malpractice cause of action will be lost forever.

■■■ 50. On the other hand, a statute of repose terminates the right to any action after a specific time has elapsed, even though no injury has yet manifested itself. DeVries, *supra*, at 414–15. A statute of repose runs from a statutorily determined triggering event. The triggering event of Section 41–5–13 is determined by the occurrence rule. This event is unrelated to the accrual date of the cause of action, and does not entail whether the injury has even been discovered. *Garcia*, 119 N.M. at 537, 893 P.2d at 433. In this sense, if, four years after the occurrence of medical malpractice, a patient learns they have been injured, their claim is forever barred because Section 41–5–13 functions as a statute of repose.

51. New Mexico appellate courts have consistently construed Section 41–5–13 according to its plain meaning as an occurrence rule. *See Roberts*, 114 N.M. at 250, 837 P.2d at 444 (stating the time period begins to run on the date the malpractice occurred); *Irvine v. St. Joseph Hosp., Inc.*, 102 N.M. 572, 575, 698 P.2d 442, 445 (Ct.App.1984) (same concept), *cert. quashed*, 102 N.M. 564, 698 P.2d 434 (1985); *Kern*, 102 N.M. at 455, 697 P.2d at 138 (same concept); *Keithley v. St. Joseph's Hosp., Inc.*, 102 N.M. 565, 568–69, 698 P.2d 435, 438–39 (Ct.App.1984) (same concept), *writ quashed*, 102 N.M. 565, 698 P.2d 435 (1985).

■■■ 52. We find no merit in Cummings' broad interpretation of "occurrence" as a continuum encompassing both the act of malpractice and the resulting injury. Cum-

mings offers language from *Folz v. State*, 110 N.M. 457, 797 P.2d 246 (1990), as support for this position. *Folz* concerned a negligence claim against the State Highway Department and others for a calamity at a mountain highway construction project. A combination of several negligent acts and omissions resulted in a runaway truck smashing into five vehicles, killing and injuring several people as it careened down a mountain road. *Id.* at 460–61, 797 P.2d at 249–50. The question was whether, under NMSA 1978, § 41–4–19(A)(3) (Repl.Pamp.1989), *amended by* 1991 N.M.Laws, ch. 205 § 3 (codified as amended at NMSA 1978, § 41–4–19(A)(3) (Cum.Supp.1995)), the various negligent acts, collisions, and injuries constituted a "single occurrence" or several occurrences. *Folz*, 110 N.M. at 460, 797 P.2d at 249; *see also* Section 41–4–19(A)(3) (delineating state liability "for all claims arising out of a single occurrence"). We concluded—in the language quoted by Cummings—"that all injuries proximately caused by the governmental agency's successive negligent acts or omissions that combined concurrently to create a singular, separate, and unitary risk of harm fell within the meaning of a 'single occurrence' when triggered by the discrete event of one runaway truck." *Folz*, 110 N.M. at 465, 797 P.2d at 254. Cummings uses this language to suggest that the "occurrence" for purposes of the Medical Malpractice Act includes both the negligent act and the resulting harm. However, *Folz* is inapplicable to the language of the Medical Malpractice Act. *Folz* concerned the interpretation of a specific term from the Tort Claims Act—"single occurrence"—which we construed as referring only to a unitary risk of harm triggered by a discrete event. *Id.* at 465, 797 P.2d at 254 (defining "single occurrence" as "unitary risk of harm ... triggered by [a] discrete event"). The term "occurred" from the medical malpractice statute does not inquire into whether the act caused an injury, whether the injury is immediate or latent, whether the injury is discovered or not. The focus of this term is on the act without regard to its consequences. There is no relationship between the meaning of "occurred" in Section

41–5–13 and "single occurrence" in Section 41–4–19(A)(3). Each is a term of art applicable to a particular body of tort law.

53. Because the cause of action runs from the date of the act of malpractice, there is no merit to Cummings's suggestion that her cause of action accrued when the metastasis was discovered. Other jurisdictions have declared that the "patient's awareness of metastasis is the relevant trigger for purposes of the statute of limitations." *Colbert v. Georgetown Univ.*, 623 A.2d 1244, 1250 (D.C. 1993), *vacated*, 641 A.2d 469 (D.C.1994) (en banc); *Johnson v. Mullee*, 385 So.2d 1038, 1039–40 (Fla.Dist.Ct.App.1980) (same concept), *review denied*, 392 So.2d 1377 (1981). None of these cases are applicable in New Mexico. The plain language of Section 41–5–13 establishes the date of the act of malpractice as the only relevant factor, without any reference to any subsequent harm.

## C. Exceptions to the Occurrence Rule

■ 54. We have found that only in very few exceptional circumstances may this strict three-year occurrence rule of Section 41–5–13 be relaxed. None of these exceptions applies to Cummings. Fraudulent conduct has always provided equitable grounds for relaxing a statutory time limit. *Kern*, 102 N.M. at 456, 697 P.2d at 139 (holding that the three-year limit of Section 41–5–13 may be tolled when a physician by fraudulent concealment prevents the patient from discovering the injury); *see also Keithley*, 102 N.M. at 569, 698 P.2d at 439 (same concept). As mentioned above, we concluded in *Roberts v. Southwest Community Health Services* that *non*-qualified health care providers were subject to liability under a discovery rule rather than the three-year occurrence rule of Section 41–5–13. 114 N.M. at 254, 837 P.2d at 448.

55. In *Garcia ex rel. Garcia v. La Farge* the misdiagnosis of the patient's malady revealed itself only eighty-five days short of the running of the time limit of Section 41–5–13. 119 N.M. at 534, 893 P.2d at 430. We concluded that in this situation "Section 41–5–13

left an unconstitutionally short period of time within which the [patient] could file suit after [the] cause of action accrued." *Id.* at 539–40, 893 P.2d at 435–36.

56. Sometimes the patient will find themselves in a "Catch–22" situation in which the peculiar facts of a particular case conflict with the filing requirements of the Medical Malpractice Act. We have, in such situations, when a good faith effort has been made to comply with the Act, permitted the patient to go forward with a claim that might otherwise be lost. Two cases concerned such circumstances: *Grantland v. Lea Regional Hospital, Inc.*, 110 N.M. 378, 380, 796 P.2d 599, 601 (1990) (concluding that Section 41–5–22, which tolls the limitations period upon submission of a case to the commission, should be applied equally to claims against both qualified and non-qualified health care providers), and *Otero v. Zouhar*, 102 N.M. 482, 484–85, 697 P.2d 482, 484–85 (1985) (concluding that malpractice court proceedings, interlocutory in nature, did not preclude the patient from bringing malpractice claim at conclusion of court proceedings), *overruled on other grounds by Grantland*, 110 N.M. at 380, 796 P.2d at 601. None of the above mentioned exceptions applies to Cummings' circumstances.

## D. Cummings' Claim is Time–Barred

■ 57. Though it is possible, under the plain meaning of Section 41–5–13, for a patient to discover they have been injured after the three-year period has expired, Cummings' case does not present such a situation. The most determinative fact against Cummings is that she did not exercise diligence when she first learned she had been misinformed about the mass in her lung by X–Ray Associates. She was last treated by X–Ray Associates on August 10, 1988. This was the "date that the act of malpractice occurred" for the purposes of Section 41–5–13. She thus had until August 10, 1991, three years after the act, to file a claim for malpractice against X–Ray Associates. She discovered that the masses in her lung and kidney were cancer on February 23, 1990. At that time

there was still about a year and a half before the statute of repose on her malpractice claim expired. Nevertheless, she sat on her rights and did not file any claim for more than two years, on July 27, 1992. By that time, almost four years had passed since the 1988 act of malpractice. She did not sue X–Ray Associates until December 7, 1993, more than five years after the act. Cummings lost her medical malpractice claim through her own lack of diligence.

58. Cummings responds that she had suffered no injury under the terms of the Medical Malpractice Act merely because she learned that the lung mass was cancer rather than an AVM. She points out that the cancer was present in 1986 when the mass was first discovered, in 1988 during the pre-operation x-rays, and in 1990 when it was first properly diagnosed. The discovery of cancer, she asserts, did not at all change her position. The surgical removal of the cancer in March 1990 would have been no different had it been performed in 1986 when the lung mass was first revealed. Cummings' arguments are untenable. The fact that the cancer had been discovered within the three-year limitation period would have given Cummings a decisive cause of action. It was certainly possible for Cummings to have demonstrated some harm or increased risk, even if metastasis could not be detected. By not pursuing a malpractice claim upon discovery of her injury, Cummings lost her cause of action.

59. Cummings argues that the Medical Malpractice Act cannot be so harsh that the limitations period can run on a potential malpractice claim before the claim even comes into existence. However, this was an intentional consequence of the Act. It is irrelevant that the patient loses his or her malpractice claim through "blameless ignorance." *Urie v. Thompson,* 337 U.S. 163, 170, 69 S.Ct. 1018, 1025, 93 L.Ed. 1282 (1949). The only variable is the date the act of malpractice took place. Courts often point out that it is not their responsibility to inquire into the harshness of a legislative en-

actment, the strategy behind a legislative policy, or even the wisdom of a legislative solution to a particular problem. *See Atencio,* 90 N.M. at 788, 568 P.2d at 1234; *Irvine,* 102 N.M. at 576, 698 P.2d at 446. The Court appreciates Cummings' circumstances. Nevertheless, her medical malpractice claim is time-barred by Section 41–5–13.

## V. CONCLUSION

60. For the foregoing reasons we conclude that Cummings' medical malpractice claim is constitutionally barred by three-year statute of repose of Section 41–5–13. We affirm the decision of the trial court.

**IT IS SO ORDERED.**

FROST, C.J., and RANSOM, J., concur.